MY BREAD BAKING CO. *vs.* CUMBERLAND FARMS, INC. & others.[1]

Bristol.   January 4, 1968. — February 5, 1968.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & REARDON, JJ.

*Corporation,* Corporate entity.   *Agency,* What constitutes.   *Conversion.*

Discussion of preserving or disregarding corporate entities.   [618–620]
In the circumstances, in an action for conversion of certain appliances owned by the plaintiff and installed, in connection with the sale of the plaintiff's bakery products, in various retail stores selling dairy products, a conclusion was warranted that a corporation processing and packaging the dairy products sold in the stores was liable for the conversion, which occurred when, at the termination of the arrangement for the sale of the plaintiff's bakery products in the stores, the managers thereof refused to return the appliances to the plaintiff, where it appeared that, although the stores were operated in groups by other corporations which were not subsidiaries of the processing corporation, the stock in all the corporations was owned by the same family, that

---

[1] Cumberland Farms Dairy Stores, Inc., Cape Cod Farms, Inc., Narragansett Food Stores, Inc., Central Food Stores, Inc., and Commonwealth Dairy Stores, Inc. are the codefendants.

they all had the same officers and directors, that they were all operated as a single enterprise from a single headquarters and used the name of the processing corporation as a trade name, and that it could be properly inferred that an officer of the corporations who ordered the store managers not to return the appliances to the plaintiff was a dominant figure in the whole enterprise and acted for the processing corporation in originally negotiating the arrangement with the plaintiff and thereafter in all matters affecting the plaintiff and that the other corporations whose store managers followed the officer's order acted as agents of the processing corporation. [620–621]

TORT. Writ in the Superior Court dated October 2, 1963. The action was tried before *Mitchell, J.*

*Allan van Gestel* for Cumberland Farms, Inc.

*Charles R. Desmarais* for the plaintiff.

CUTTER, J. The remaining count in this action alleges conversion of certain property by Cumberland Farms, Inc. (C.F. Inc.). There was a substantial verdict for the plaintiff (My Bread) against C.F. Inc. and also a verdict for each codefendant (fn. 1). The case is before us on C.F. Inc.'s exception to the judge's refusal to direct a verdict for it. The facts are stated in their aspect most favorable to My Bread.

In August, 1960, Byron Haseotes discussed with Joseph Duchaine, "the sole proprietor" of My Bread, the sale of the latter's bakery products in "Cumberland Farms" retail dairy stores. Haseotes was the secretary and treasurer and a stockholder of C.F. Inc., of each codefendant, and of fifteen other corporations.

After August, 1960, My Bread began selling its bakery products in the retail dairy stores, and provided bakery racks for use in this operation. The racks were delivered by My Bread directly to the local store in which they were used.[2] In September, 1963, when the business arrangement with My Bread was terminated, My Bread sought the return of the racks. It was prevented by the local store managers, acting on the instructions of Haseotes, from recovering them from all but a few of the "Cumberland Farms" stores. Title to the racks remained in My Bread at all times.

---

[2] These racks consisted of a check-out counter on which the store cash register was placed, a gondola, and a bakery rack.

In August, 1960, the capital stock of C.F. Inc. and of each codefendant was owned by Haseotes, his parents, his brothers, and his sisters. There was no joint financing of these corporations. The officers and directors of each corporation were the same. The sole business of the codefendants "was the operation of chains of [small] retail dairy stores . . . in Massachusetts . . .." C.F. Inc. did not operate retail stores.[3] It conducted "a bottling . . . plant which processed and packaged milk and other dairy products and . . . [sold] its dairy products at . . . wholesale . . . to the . . . five" codefendants. Haseotes testified that in August, 1960, C.F. Inc. did not sell dairy products to all of the "Cumberland Farms" stores in which My Bread was to sell its bakery products. In 1962 or 1963, however, it began to do so. All of the defendants used the trade name "Cumberland Farms." Persons dealing with all of these corporations treated them as "Cumberland Farms."

C.F. Inc. never owned any stock interest in the five codefendants, nor did those corporations own any stock in it. The advertising of all six corporations was purchased in separate transactions and always used the trade name "Cumberland Farms."[4] In August, 1960, the Haseotes family dairy businesses were operated out of headquarters in Woonsocket. Processing and bottling were then done in two plants, one in Woonsocket and the other in Boston. Prior to the alleged conversion, the Woonsocket and Boston plants were consolidated in a new plant in Canton, and each defendant corporation moved its principal office to that

---

[3] Each of the codefendants operated stores in a specified area in Massachusetts or Rhode Island. Each corporation "designated its various stores by numbers in a series. Thus, for example, stores operated by Commonwealth Dairy Stores, Inc. each had a store number from 300 to 399 . . . . These store numbers were used in . . . correspondence between the parties." From 1960 to 1963, C.F. Inc. had a peddler's license for the sale of milk in the New Bedford area. It owned trucks and delivered milk in 1960 and 1961 in connection with sales of milk to the store operating corporations by the processing plants.

[4] The telephone operator at the consolidated Canton plant usually answered the telephone by saying "Cumberland Farms" except when a caller called on a line for one of the Haseotes family's real estate corporations.

plant.  Thereafter the "same business manager operated all the businesses from the Canton address."  Haseotes "participated in the operation of all the corporations and it was his decision where money was to go in the various corporations."

In August, 1963, Haseotes as sales manager of C.F. Inc., signed and sent out circular memoranda concerning the sale of bread (including My Bread products) in "Cumberland Farms" stores.  These were on C.F. Inc. letterhead and were addressed to a large number of retail stores or store managers in mandatory language, using such terms as "must" and stating policies "to be strictly adhered to."  There was in evidence a loaf which had on its wrapper the name "Cumberland Farms" and a notation that it was distributed by "Cumberland Farms, Inc. of Boston."

Haseotes testified that, in his dealings with My Bread, he never acted on behalf of C.F. Inc. because that corporation did not operate retail stores, nor did it have any control over the store operating corporations.  One of My Bread's officers, however, testified that he "always dealt with . . . Haseotes as 'Cumberland Farms'," although he did on occasion on Haseotes's request make out checks [5] to other corporations.  He also obtained certificates of insurance which included the names of several of the Haseotes corporations.

1. C.F. Inc. contends that the conversions of the bakery racks were "committed by the local store managers, employed by the [codefendant] store-operating corporations," that there was no evidence that these managers were agents for C.F. Inc. so as to make that corporation liable for their acts, and that the codefendant corporations must each be treated as distinct and separate from C.F. Inc. and each

---

[5] From August, 1960, through September, 1963, My Bread made payments in connection with the sale of its products in "Cumberland Farms" dairy stores.  From November 29, 1962, to August 10, 1963, some five checks (totaling $9,477) from My Bread payable to C.F. Inc. were delivered to and cashed by C.F. Inc.  These moneys were deposited in C.F. Inc.'s account and then were withdrawn and applied to the appropriate store operating corporation account.  On other occasions, My Bread checks were made payable to the various codefendant corporations by name.

other. The issue, of course, is whether there was evidence which, on any theory of law, would warrant the jury in finding C.F. Inc. liable for the conversions.

C.F. Inc. thus seeks to have us apply the principle that corporations are generally to be regarded as separate from each other and from their respective stockholders (see *Marsch* v. *Southern New England R.R.* 230 Mass. 483, 498) where there is no occasion "to look beyond the corporate form for the purpose of defeating fraud or wrong, or for the remedying of injuries." See e.g. *M. McDonough Corp.* v. *Connolly*, 313 Mass. 62, 65–66.[6] The general principle is not of unlimited application. A corporation or other person controlling a corporation and directing, or participating actively in (see *Refrigeration Discount Corp.* v. *Catino,* 330 Mass. 230, 234–236), its operations may become subject to civil or criminal liability on principles of agency or of causation. See *Commonwealth* v. *Abbott Engr. Inc.* 351 Mass. 568, 579–580. See also *Rock-Ola Mfg. Corp.* v. *Music & Television Corp.* 339 Mass. 416, 422–423. This may sometimes occur where corporations are formed, or availed of, to carry out the objectives and purposes of the corporations or persons controlling them. See *Rice* v. *Price*, 340 Mass. 502, 511–512; *Centmont Corp.* v. *Marsch*, 68 F. 2d 460, 464–465 (1st Cir.), cert. den. 291 U. S. 680. See also *Finnish Temperance Soc. Sovittaja* v. *Finnish Socialistic Publishing Co.* 238 Mass. 345, 354–356; *Henry F. Michell Co.* v. *Fitzgerald, ante,* 318, 321–322. The circumstances in which one corporation, or a person controlling it, may become liable for the acts or torts of an affiliate or a subsidiary

---

[6] See also *Hanson* v. *Bradley*, 298 Mass. 371, 379–382; *Browne* v. *Brockton Natl. Bank*, 305 Mass. 521, 529–531; *Leventhal* v. *Atlantic Fin. Corp.* 316 Mass. 194, 198–201; *Galdi* v. *Caribbean Sugar Co.* 327 Mass. 402, 407–408; *291 Washington St. Inc.* v. *School St. Liquors, Inc.* 331 Mass. 150, 152–153; *Franks* v. *Markson*, 337 Mass. 278, 282; *Perry* v. *Perry*, 339 Mass. 470, 478–479; *Albre* v. *Sinclair Constr. Co. Inc.* 345 Mass. 712, 717. See also *Berry* v. *Old So. Engraving Co.* 283 Mass. 441, 450–451, which should be compared with *National Labor Relations Bd.* v. *E. C. Brown Co.* 184 F. 2d 829, 831–832 (2d Cir.); *Westland Housing Corp.* v. *Commissioner of Ins.* 352 Mass. 374, 386. Cf. *Albert Richards Co. Inc.* v. *Mayfair, Inc.* 287 Mass. 280, 288; *Packard Clothes Inc.* v. *Director of the Div. of Employment Security*, 318 Mass. 329, 334–335. Cf. also *Sherman* v. *Texas Co.* 340 Mass. 606, 608–609.

under common control have been frequently discussed.[7] Although common ownership of the stock of two or more corporations together with common management, standing alone, will not give rise to liability on the part of one corporation for the acts of another corporation or its employees, additional facts may be such as to permit the conclusion that an agency or similar relationship exists between the entities. Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting. In such circumstances, in imposing liability upon one or more of a group of "closely identified" corporations, a court "need not consider with nicety which of them" ought to be held liable for the act of one corporation "for which the plaintiff deserves payment." See *W. W. Britton Inc.* v. *S. M. Hill Co.* 327 Mass. 335, 338–339.

It may be, as one commentator suggests (see Peairs, Business Corporations §§ 8–10, esp. at p. 33), that Massachusetts has been somewhat more "strict" than other jurisdictions

[7] See *The Willem Van Driel, Sr.* 252 Fed. 35, 37–39 (4th Cir.), cert. den. sub nom. *Pennsylvania R.R.* v. *Naam Looze Vennoot Schap,* 248 U. S. 566; *Luckenbach S.S. Co. Inc.* v. *W. R. Grace & Co. Inc.* 267 Fed. 676, 681 (4th Cir.), cert. den. 254 U. S. 644; *Costan* v. *Manila Elec. Co.* 24 F. 2d 383, 384–385 (2d Cir.); *G.E.J. Corp.* v. *Uranium Aire, Inc.* 311 F. 2d 749, 756–757 (9th Cir.); *Consolidated Sun Ray, Inc.* v. *Oppenstein,* 335 F. 2d 801, 806–808 (8th Cir.). See also Fletcher, Cyc. Corporations (Perm. ed.) §§ 41–47; Cavitch, Business Organizations, § 120.05; Oleck, Modern Corporation Law (and 1965 supp.), § 10; Henn, Corporations, §§ 143–145; Ballantine, Corporations (Rev. ed.) §§ 134–138; Douglas and Shanks, Insulation from Liability through Subsidiary Corporations, 39 Yale L. J. 193, 195–210; Cataldo, Limited Liability with One-Man Companies and Subsidiary Corporations, 18 Law and Contemp. Prob. 473, 488–496; note, 71 Harv. L. Rev. 1122; annotation, 7 A. L. R. 3d 1343. Cf. *Steven* v. *Roscoe Turner Aeronautical Corp.* 324 F. 2d 157, 160–161 (7th Cir.); *Markow* v. *Alcock,* 356 F. 2d 194, 197–198 (5th Cir.); *National Bond Fin. Co.* v. *General Motors Corp.* 238 F. Supp. 248, 254–258 (W. D. Mo.), affd. 341 F. 2d 1022 (8th Cir.).

in respecting the separate entities of different corporations. Nevertheless, our law concerning disregarding the corporate fiction has been stated, in cases already cited, essentially in the same general terms employed in decisions elsewhere (fn. 7). Where there is common control of a group of separate corporations engaged in a single enterprise, failure (a) to make clear which corporation is taking action in a particular situation and the nature and extent of that action, or (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses (see *Acton Plumbing & Heating Co.* v. *Jared Builders, Inc.* 368 Mich. 626, 628–630), records, and finances, may warrant some disregard of the separate entities in rare particular situations in order to prevent gross inequity.

2. On the evidence the jury could reasonably have reached the following conclusions. (a) Haseotes was responsible by an order to the local stores for a high-handed, inexcusable refusal by employees of the various retail stores to return My Bread's racks to it at the termination of the bread sale arrangement. (b) Although no one of the codefendant operating store corporations was a subsidiary of C.F. Inc. (in the sense that C.F. Inc. owned the whole or a part of its stock), all the defendant corporations (including C.F. Inc.) were under the full stock control of the Haseotes family and were operated as a closely coördinated single enterprise. Haseotes himself could be found to have been a dominant figure in the whole "Cumberland Farms" enterprise. (c) The basic common enterprise was the processing, distribution, and sale of milk and dairy products. C.F. Inc., on the evidence, could reasonably be regarded as the principal corporation of the enterprise and the codefendants as its affiliates or satellites so that, when one thought of "Cumberland Farms," one would naturally think of C.F. Inc. (d) Because all the corporations were operated ambiguously from the same headquarters as part of a single enterprise, the jury could reasonably infer that Haseotes, in furtherance of the interests of C.F. Inc. in the distribution of its prod-

ucts, was intervening actively in the conduct of the satellite corporations. (e) Haseotes without (so far as this record shows) clear indication of the capacity in which (and the corporation for which) he was acting, dealt in 1960 with Duchaine of My Bread for "Cumberland Farms" in a very confused manner. Although My Bread's representatives probably knew of the existence of the separate corporations, they might reasonably think (absent a clear indication by Haseotes that he was acting for the retail store corporations and not for C.F. Inc.) that My Bread, with respect to the general wholesale distribution of bread, was dealing with C.F. Inc. That was the corporation which was engaged, for the whole "Cumberland Farms" enterprise, in the general wholesale distribution of milk and other dairy products. It would have been the logical corporation to arrange to purchase bread at wholesale for distribution through the "Cumberland Farms" stores. (f) The bill of exceptions reveals no basis for an inference that any of the codefendants was inadequately capitalized, a ground frequently relied upon, when taken with other factors, as permitting disregard of a corporate entity. See e.g. *Mull* v. *Colt Co. Inc.* 31 F. R. D. 154, 158–166 (S. D. N. Y.). Cf. *Hanson* v. *Bradley,* 298 Mass. 371, 380–381; *Eskimo Pie Corp.* v. *Whitelawn Dairies, Inc.* 266 F. Supp. 79, 82 (S. D. N. Y.); *Walkovszky* v. *Carlton,* 18 N. Y. 2d 414, 420–421.

The jury could properly infer (because of Haseotes's actions, the general corporate situation, and Haseotes's failure to dispel ambiguities) that Haseotes in all matters connected with the My Bread arrangement was acting for C.F. Inc. and that the satellite companies in following Haseotes's orders concerning the bread racks (fn. 2) were caused to act by C.F. Inc. and were acting as its agents. See *Mueller* v. *Seaboard Commercial Corp.* 5 N. J. 28, 33–35. See also *Wallach* v. *Hadley Co.* 331 Mass. 699, 701.

The jury could reasonably decide that C.F. Inc., through Haseotes, brought about and was liable for the conversions. A directed verdict was properly refused.

*Exceptions overruled.*