ROBERT EVANS vs. MULTICON CONSTRUCTION
CORPORATION & others[1]
(and a companion case).[2]

No. 89-P-1126.

Hampden. February 5, 1991. - June 21, 1991.

Present: PERRETTA, KASS, & GREENBERG, JJ.

*Corporation*, Corporate entity. *Practice, Civil*, Judgment, Execution. *Indemnity. Contract*, Parties, Indemnity, Construction contract, Subcontract. *Consumer Protection Act*, Businessman's claim, Availability of remedy. *Evidence*, Verbal completeness.

Discussion of the factors guiding a court's decision whether to disregard the existence of a corporation as a separate entity. [732-733]

In a proceeding under Mass.R.Civ.P. 69 by a subcontractor seeking satisfaction of a judgment against a general contractor, the facts as found by the judge warranted his conclusion that the manner of the general contractor's functioning as part of a larger enterprise did not justify looking beyond its corporate form and imposing liability upon either its present parent corporation or the two individuals who had been its stockholders at the time of contracting. [733-738]

In a proceeding under Mass.R.Civ.P. 69 seeking satisfaction of a judgment, the plaintiff did not carry his burden of showing that any of the former assets of the judgment debtor, by reason of fraudulent transfer, were susceptible of being reached and applied to satisfy the judgment. [738-739]

A judgment creditor had no rights under an indemnity agreement undertaken by two individuals who had been the stockholders of the debtor corporation, where any benefit to the creditor, who was at best an incidental beneficiary, was precluded by the language of the agreement itself as well as by the law of the State under which it was to be construed. [739]

In the absence of a lien perfected under G. L. c. 254, an owner of real property was not liable to a subcontractor whose sole contractual arrangements had been with the general contractor. [740]

---

[1] John W. Kessler; Peter H. Edwards; Ivor H. Young; Sidney Herman; Georgetown of Springfield, a limited partnership organized under Ohio law; and Multicon, a limited partnership organized under Ohio law.

[2] Robert Evans vs. John W. Kessler, Peter H. Edwards, and Multicon Construction Corporation.

A plaintiff could not maintain a businessman's claim under § 11 of G. L. c. 93A, the Consumer Protection Act, based on events that occurred before § 11 was introduced into the statutory scheme. [740]

Where, in a civil proceeding, the plaintiff introduced only a portion of the defendants' numerous responses to requests for admissions, the defendants were entitled, under the rule of completeness, to introduce the responses that the plaintiff had omitted. [740-741]

CONTRACT. Writ in the Superior Court dated December 29, 1967. After review reported in 6 Mass. App. Ct. 291 (1978), a motion in aid of judgment was filed on September 18, 1978.

CIVIL ACTION commenced in the Superior Court Department on October 25, 1979.

The proceedings were consolidated and were heard by *John F. Murphy, Jr.,* J.

*Louis Kerlinsky* for the plaintiff.

*Paul S. Weinberg* for John W. Kessler & others.

KASS, J. More than a decade after initiating the action, Robert Evans on August 9, 1978, achieved the entry of a judgment of $124,176.45 in his favor against Multicon Construction Corporation ("MCC"). By that time, MCC, an Ohio corporation, had ceased doing business in Massachusetts, and, if it existed at all, was an empty shell. This appeal concerns Evans' efforts to reach alternate sources of recovery.

In its heyday, MCC was a component of a complex[3] real estate development enterprise operating on a national scale out of Columbus, Ohio. At the core of that enterprise were John W. Kessler and Peter H. Edwards, who were the general partners of Multicon, a limited partnership formed under Ohio law. Multicon's business was to build and manage garden apartments, and it did so in thirteen states in the eastern half of the United States. In 1965, Multicon acquired a location for a project on the Springfield-

---

[3]It may assist the reader in keeping track of the considerable number of persons and business entities involved in the case to keep at hand a table of abbreviations and explanations of those abbreviations which appear in an appendix to this opinion.

Longmeadow line. For each of the thirty developments it built, Multicon would establish a limited partnership into which it took investing limited partners. Thus, in the case of the Massachusetts development, Multicon formed, again under Ohio law, a limited partnership called Georgetown of Springfield ("Georgetown"). Multicon leased the Springfield location to Georgetown for a term of fifty years.

To act as general contractor for their organization's projects, Edwards and Kessler in 1966 organized MCC with a capitalization of $500, the minimum then required under Ohio law.[4] MCC appears to have been an office or paper contractor, i.e., it did not itself dig holes in the ground, erect walls, install plumbing, or paint, but, instead, it let subcontracts for all aspects of a job. This was not, of course, insignificant work; purchase of services, materials, and equipment was involved as well as estimating, scheduling, supervision, inspection, and coordination. MCC maintained a presence as a foreign corporation in Massachusetts from 1966 through 1970, and during that period faithfully filed certificates of condition. Although at all times thinly capitalized, MCC was not without assets during that period. Its statements reflect assets as follows:

| At end 1966 | $287,856.02 |
|---|---|
| At end 1967 | $357,305.80 |
| At end 1968 | $510,021.70 |
| At end 1969 | $1,121,484.98 |
| At end 1970 | $2,429,598.38 |

At none of the times when Edwards and Kessler were the controlling persons in MCC did that corporation pay dividends, bonuses, or other distributions to them. So far as the record reveals, all disbursements of MCC were in the ordinary course of its contracting business. On September 20, 1969, Edwards and Kessler organized Multicon Properties, Inc. (MPI), to assume property management and other oper-

[4] By reason of an amendment enacted in 1984, the $500 minimum capital requirement of Ohio corporate law has been eliminated. See Ohio Rev. Code Ann. § 1701.30(A)(Baldwin 1986).

ational duties (e.g., payroll) for the many business entities under the Multicon umbrella, duties which previously had been performed by Multicon. Edwards and Kessler then exchanged with MPI their stock in MCC for stock of MPI so that the construction contracting corporation became a wholly owned subsidiary of MPI.

From the dazzling maneuvers of Edwards and Kessler we flash back to the comparatively mundane quarrel between MCC and Evans, some of which is recounted in *Evans* v. *Multicon Constr. Corp.*, 6 Mass. App. Ct. 291 (1978). Evans, acting as a subcontractor to MCC, did excavation work in 1966-1967 on the Georgetown job. He claimed an extra, there was a counterclaim, and after Evans commenced an action by a writ dated December 29, 1967, the whole affair was referred to an auditor, facts not final. The auditor reported on January 29, 1969, that MCC owed Evans $542.12. Evans took the case to a jury and won a verdict of $62,100, returned on March 25, 1976. Now MCC was aggrieved, moved for a new trial and received one. The second trial produced a verdict for Evans of $53,653.30 on February 23, 1977. An appeal followed, which reinstated the first jury verdict and resulted in the August, 1978, judgment of $124,176.45. When time flies, so does interest.

While the Evans versus MCC litigation was playing itself out, MCC, having no further work in Massachusetts, receded from the local scene. In April, 1970, Bethlehem Steel Corporation purchased stock of MPI sufficient to control it, and thereby its subsidiaries, including MCC. By 1973, Bethlehem acquired all the stock of MPI and after December, 1973, Edwards and Kessler had no further office or any other responsibility in MPI or MCC. In connection with the sale of their stock in MPI to Bethlehem in 1970, Edwards and Kessler each received $2,049,500.[5] Thereafter, the trail as to MCC

---

[5]For that amount of money, Bethlehem was presumably buying more than a management company, but the record is unhelpful as to precisely what Bethlehem acquired in connection with the MPI stock. Edwards and Kessler had substantial equity in each of the thirty residential developments built under the Multicon umbrella.

becomes obscure, but this much is agreed upon: when a judgment against MCC was finally entered in 1978, it could not answer to it.

Prior to 1978, Evans had made no demand on Multicon, Georgetown, Bethlehem, Edwards or Kessler. When his claim was finally reduced to judgment, Evans appropriately employed Mass.R.Civ.P. 69, 365 Mass. 836 (1974), to sniff for assets of MCC from which the judgment could be realized. Rule 69, in aid of a judgment, makes available postjudgment discovery and equips the court with "all the traditional flexibility of a court of equity," including enforcement of orders of the court against persons who may not originally have been parties. *Geehan* v. *Trawler Arlington, Inc.*, 371 Mass. 815, 817-818 (1977). Evans supported his motion in aid of judgment with responses by MCC to Evans' requests for admissions, documents, memoranda, and argument. The dominant theme of the motion and the evidence presented in the framework of the motion was that MCC had been a sham corporation functioning as a straw for its principals, Edwards and Kessler. They were the prime targets of the motion.[6]

1. *Whether there is occasion to look beyond the corporate liability of MCC to controlling officers, directors, or shareholders to satisfy the judgment.* In "rare particular situations to prevent gross inequity," disregard of separate corporate entities may be warranted, i.e., it is permissible to pierce the corporate veil. *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 620 (1968). Occasion for doing so arises when (1) there is active and pervasive control of related business entities by the same controlling persons *and* there is a fraudulent or injurious consequence by reason of the relationship among those business entities; or (2) there is "a confused intermingling of activity of two or more corpora-

---

[6]The motion also drew aim on two other original partners in Multicon, Sidney Herman and Ivor H. Young, but they had withdrawn from Multicon before construction started on the Springfield job. Although Evans has not withdrawn his claim against them, we do not think that claim warrants discussion.

tions engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting." *Id.* at 619.

Those criteria were further broken down in *Pepsi-Cola Metropolitan Bottling Co.* v. *Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985), into twelve factors which should be considered in deciding whether to penetrate the corporate form: (1) common ownership; (2) pervasive control; (3) confused intermingling of business activity assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; (12) use of the corporation in promoting fraud.

Matched against those indicators, the facts found by the judge (who heard the rule 69 motion), while they may not provide an immediately obvious answer, point reliably to a conclusion when analyzed and considered in an integrated fashion.

(1) There was common ownership among MCC, Georgetown, Multicon, and MPI, in the sense that Edwards and Kessler were a significant presence in all of them, but Edwards and Kessler had partners in Multicon and Georgetown to whom they owed a fiduciary duty. See *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. 842, 848 (1976). Edwards and Kessler could not, and did not, run MCC as their own candy store. MCC had to deliver value to the various limited partnerships for which it built. The record establishes that the several entities in the Multicon complex were operated on an arm's length basis as to one another.

(2) There was, from 1966, when Evans first performed services as a subcontractor for MCC, through 1970, after the litigation had commenced, pervasive control by Edwards and

Kessler. They were the controlling persons in the Multicon complex and its many sub-entities.

(3) There was not confused intermingling of business activity, assets, or management. The business of MCC was clearly defined. It managed the construction operations for Multicon projects. On the basis of the record, that is all MCC did, i.e., MCC did not engage in identifying and acquiring project locations, the formation of local partnerships, advertising, or property management. MCC maintained accounting records separate from other Multicon enterprises, with separate ledgers for each construction job, quarterly financial statements, and annual audits by public accountants.

(4) Capital was unquestionably thin, i.e., $500, but the pertinent question is whether it was too thin. MCC had no need for heavy equipment or even an imposing front to win jobs. However it was done — the peculiarly shapeless record-appendix does not assist understanding — Edwards and Kessler provided MCC with the up-front financing needed to assemble a staff of construction managers and supporting personnel in Ohio and regional operations in the areas where jobs were being built. During its active corporate life, MCC did not want for assets.

(5) Care seems to have been taken in the observance of corporate formalities. MCC's payroll was managed by MPI, but there is no suggestion that the funds used to pay MCC employees were other than MCC's. Separate tax returns were meticulously filed. Throughout its years of activity in Massachusetts, MCC filed certificates of condition with the Secretary of the Commonwealth.

(6) Separate corporate records appear to have been maintained for MCC, and the record does not suggest that corporate records of MCC are either missing or fudged.

(7) During its period of activity, MCC did not pay dividends, make other distributions of profits, or accumulate surplus earnings. There were no instances of payment of unreasonable salaries or bonuses to persons employed by MCC. Evans makes the argument that MCC's failure to operate so as to turn a distributable profit, even in a year when it

awarded subcontracts totalling $23,639,394.66, is a telltale that it was a dummy corporation whose veil ought to pierced. Corporations with an appreciable number of stockholders conduct business with a view to stockholder gain. See American Law Institute, Principles of Corporate Governance: Analysis and Recommendations § 2.01(a) (Tent. Draft No. 11, 1991). When the corporation is closely held, that gain may take a form other than the payment of dividends or distributions to stockholders. So it is that in closely held corporations, a stockholder's reward may be employment by the corporation, thereby to earn a salary, bonus, or retirement benefit. *Wilkes* v. *Springside Nursing Home, Inc.*, 370 Mass. at 850. In this case the gain for Edwards and Kessler, as stockholders of MCC, was the construction of garden apartment projects in which they had major interests at a cost which had a normal contractor's profit squeezed out. It was doubtless more advantageous in the 1960's for Edwards and Kessler and their partners to acquire capital assets at a lower basis than to accumulate a surplus in MCC or to cause MCC to pay dividends taxable at ordinary rates. Such was a legitimate business purpose for them.

(8) At the time of the litigated transaction, MCC was not insolvent. MCC's cash position at the end of 1966 was $121,762.67 and at the end of 1967 it was $275,731.43. There is no suggestion that MCC during that period, or at any time while it was active, experienced difficulty in paying debts as they became due, a test of insolvency. See Edwards and Black, The Modern Accountant's Handbook 590-591 (1976). While for the years in question, assets and liabilities were in close balance, those assets were sufficient to pay existing debts as they became absolute and matured. G. L. c. 109A, §2(1). At the end of its active period, December, 1973, MCC showed assets in excess of liabilities and retained earnings of $1,109.

(9) The judge who heard the rule 69 motion in aid of judgment found that there had been no payments or dividends to officers, directors or stockholders of MCC while Kessler and Edwards had any connection with it and that the Internal

Revenue Service had not challenged any payments to officers or directors. We may conclude, therefore, that there was no siphoning away of corporate assets by Edwards and Kessler, the dominant stockholders.

(10) Edwards and Kessler functioned actively as officers and directors of MCC, although they were not the only officers and directors of MCC.

(11) Edwards and Kessler, indeed, used the corporation in aid of transactions in which they had substantial interest.

(12) There is no basis to conclude that MCC was used to perpetrate a fraud. MCC did not masquerade as something it was not. Its connection with the Multicon enterprise was not merely disclosed, it was ostentatious; it used the Multicon name. The financial status of MCC was ascertainable from the certificates of condition on file, documents which did not hide that invested capital was thin. The corporation awarded subcontracts on a market basis. So far as appears, the estimating, awarding, supervising and inspection functions were fully staffed. Names of officers were revealed. The record contains no evidence warranting a finding that MCC was established or operated so as to misrepresent or divert assets, and the judge was on solid ground in ruling that MCC had not been engaged in promoting fraud.

Four indicators point in favor of piercing the corporate veil, eight are against, but the exercise is, of course, not one in counting. One examines the twelve factors to form an opinion whether the over-all structure and operation misleads. There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance, finagling, such that corporate identities are confused and third parties cannot be quite certain with what they are dealing. Thus, in *My Bread Baking Co.* v. *Cumberland Farms, Inc,*, 353 Mass. at 620-621, a principal dealt through satellite corporations in such a confusing manner that third parties would reasonably think that the principal was dealing on behalf of the parent, where the assets were.

*Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 289-294 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972), presented a picture with some significant similarities to that of Multicon's. There were controlling officers of a parent finance company who owned all the stock of a subsidiary corporation, supplied it with operating funds, and used the subsidiary on behalf of the parent's business, all operating under the name "Beneficial." Unlike the case with Multicon, where separate corporate boundaries were carefully maintained, the picture with Beneficial was confusing and third parties thought of themselves as dealing with Beneficial. Here, it is not suggested that Evans thought he was doing excavation work for Multicon or Georgetown, or Edwards and Kessler. He entered into a conventional subcontracting arrangement with a general contracting corporation, MCC, and was not misled into doing so on the basis of who was interested in Georgetown, the owner, or Multicon, Georgetown's general partner. Compare *Westcott Constr. Corp.* v. *Cumberland Constr. Corp.*, 3 Mass. App. Ct. 294, 297 (1975) (no misleading and corporate form respected); *Gopen* v. *American Supply Co.*, 10 Mass. App. Ct. 342, 344-345 (1980) (third parties misled and corporate form disregarded). See also *Mull* v. *Colt Co.*, 31 F.R.D. 154, 159-166 (S.D.N.Y. 1962) (satellite corporate shells of cab company penetrated).

We conclude, as did the Superior Court judge, that the contract between Evans and MCC and the manner in which MCC functioned in the Multicon enterprise did not justify looking beyond MCC to its parent MPI, or to Edwards and Kessler, who had been the sole stockholders of MCC at the time of contracting.[7] The risk that a defendant, without

---

[7] In considering whether the corporate form of MCC was to be penetrated, we have applied Massachusetts law because the place of contracting, the place of negotiation of the contract, the place of performance of the contract, and the place of the subject matter of the contract were in Massachusetts. Restatement (Second) of Conflict of Laws § 188 (1969). The *My Bread Baking Co.* opinion was based on the weight of authority in Federal courts and other State courts.

fraud and in the normal course of business operations, may become unable to answer to a judgment is inherent in any civil litigation. Particularly in the area of construction, there is a statutory scheme which permits subcontractors to obtain a lien for labor or material furnished against the improved real estate. See G. L. c. 254. Evans chose not to avail himself of that remedy. A litigant may also obtain an attachment against assets of a defendant whose assets, as was the case with MCC, might not be susceptible to an execution. See Mass.R.Civ.P. 4.1, as amended, 365 Mass. 737 (1974). Evans took no protective steps in that direction.

2. *Assets of MCC susceptible of being reached and applied to MCC's judgment debt under G. L. c. 214, § 3 (6) and (8), and G. L. c. 109A, § 4.* Among the areas of inquiry authorized in connection with the rule 69 motion in aid of judgment[8] was whether property of MCC, the judgment debtor, could be located and, under statutory equitable powers of the court, reached and applied in satisfaction of MCC's judgment debt to Evans. In a sense, this is a variation on the theme discussed in part 1 of this opinion. If there is no substance to the corporate subsidiaries in the Multicon enterprise, particularly MCC, then it might be argued that whatever value there was in MCC ultimately came to rest with Edwards and Kessler, who were at the tip of the Multicon pyramid.

Once it is understood that, as administered, MCC was a legitimate, freestanding corporation, the burden of Evans is to point to specific property of MCC that was in the hands of one of the defendants or that had, at some time, been fraudulently conveyed to one of the defendants. This Evans has not succeeded in doing. As recounted in the preceding section, there was no diversion of assets from MCC in the form of dividends, unusual salaries, or bonuses. So far as appears

---

[8]The Superior Court judge who established the framework for the proceeding under Mass.R.Civ.P. 69 was not the judge who later conducted the hearing. Such have been the long life and vicissitudes of the case that nine judges of the Superior Court (plus one District Court judge sitting in Superior Court by statutory designation) have participated in various aspects of the controversy.

from the record, the diminution of the assets of MCC came about as it paid off subcontractors and suppliers in the ordinary course of business. No transfers of assets were made so as to hinder the collection by Evans of its debt. See *Ward* v. *Grant*, 9 Mass. App. Ct. 364, 367 (1980). The exchange of their shares in MCC by Edwards and Kessler for shares of MPI did not extract any assets from MCC. Parenthetically, that transaction would hardly have been entered into to defeat the Evans claim which, at the time, appeared to be $542. An unlikely liability is not a probable liability. *Commissioner of Banks* v. *Walker*, 299 Mass. 123, 128 (1937).

3. *Claim against Edwards and Kessler as indemnitors of Bethlehem.* As part of the sale of stock of MPI to Bethlehem, Edwards and Kessler agreed to indemnify Bethlehem and MPI for any liabilities of MCC arising out of events before the closing date with Bethlehem. Evans seeks to avail itself, through third-party beneficiary principles, of that obligation of Edwards and Kessler. The most immediately obvious difficulty with Evans' theory is that neither MPI nor Bethlehem had incurred liability on account of MCC's debt to Evans, and, therefore, nothing had triggered the indemnity. There is a deeper infirmity. The agreement in which the indemnity appears provided that "[n]othing herein . . . is intended to confer upon any persons, other than the parties . . . any rights. . . ." Another section of the agreement provided that it was to be construed under Ohio law, and Ohio law, as that of Massachusetts, affords third-party beneficiary rights to intended beneficiaries, not incidental ones. *Chitlik* v. *Allstate Ins. Co.*, 34 Ohio App. 2d 193, 196 (1973). *Norfolk & Western Co.* v. *United States*, 641 F.2d 1201, 1208 (6th Cir. 1980). In Massachusetts, see *Choate, Hall & Stewart* v. *SCA Servs., Inc.*, 378 Mass. 535, 546-547 n.21 (1979). See Restatement (Second) of Contracts § 302 (1981). At best, Evans was only an incidental beneficiary of the indemnity obligation taken on by Edwards and Kessler.

4. *Subsidiary points.* Evans raises many additional points. They need no extended discussion, and we shall address ourselves to them in summary fashion.

a. *Recovery against Georgetown.* Evans asserts a right to recover directly against Georgetown as it received the benefit of his work and had agreed to pay to MCC the cost of construction. In the absence of a lien perfected under G. L. c. 254, an owner who enters into a general contract for improvements on real property is not ordinarily liable to subcontractors whose sole contractual arrangements are with the general contractor. One might imagine an unusual construction contract under which the owner agreed to pay to subcontractors all claims in connection with the owner's job against the contractor which were reduced to judgment. The evidence does not, however, begin to establish an agreement along those lines between Georgetown and MCC. The parties agree that MCC worked for Georgetown on a "cost plus" basis, but that term does not imply an arrangement as open-ended as that for which the plaintiff, without evidence or authority, contends. The motion judge was right in ruling that, on the state of the record, Georgetown could not be made to answer to Evans' judgment.

b. *The c. 93A claim.* Collateral to the main case, Evans brought an action on October 24, 1979, against Edwards and Kessler charging that they and MCC had engaged in an unfair and deceptive business practice within the meaning of G. L. c. 93A, § 11, by emptying out MCC to avoid payment of Evans' judgment. Evans confronts at least two insuperable handicaps. First, as noted, the motion judge found that assets of MCC had not been expended or applied other than in the ordinary course of business. Second, the pertinent events, i.e., the performance of the subcontract, the acquisition of MCC by MPI, and the sale of the stock of Edwards and Kessler to Bethlehem, all occurred from 1966 through 1970. Section 11 of G. L. c. 93A, the businessman's right of action under c. 93A, was not introduced into the statutory scheme until 1972. See St. 1972, c. 614, § 2. We do not give retroactive application to claims under G. L. c. 93A. *Gopen* v. *American Supply Co.*, 10 Mass. App. Ct. at 348.

c. *Completeness of admissions.* Most of the information presented to the rule 69 motion judge consisted of over 700

requests for admissions and the defendants' responses. The defendants introduced in evidence responses not offered by the plaintiff. This was entirely appropriate under the principle that when a party places in evidence part of what was said or written at a particular time, the other party may add what has been omitted to give a full picture. This is sometimes referred to as the rule of completeness. See *Commonwealth* v. *Watson*, 377 Mass. 814, 825-831 (1979); Liacos, Massachusetts Evidence 443 (5th ed. 1981).

d. *Denial of motion to add Bethlehem as defendant.* During 1980 and 1981, Evans made several efforts to add Bethlehem as a defendant. The last action on that subject was a memorandum by a Superior Court judge entered February 23, 1981, which denied the motion because he thought nothing in the affidavit made in support of the motion justified the inclusion of Bethlehem. He left open, however, the possibility of a positive response to a plaintiff's motion to depose officers and agents of Bethlehem about facts which would warrant the addition of Bethlehem as a defendant. Evans never followed up that invitation. For that reason and the circumstance that none of the seven notices of appeal filed by Evans is directed to the action on the motions to include Bethlehem, the point is lost on appeal.

e. *Other.* We have considered the other points urged by the plaintiff's energetic counsel. None has merit, and none warrants even cursory discussion.

*Judgments affirmed.*

APPENDIX.

Persons and Business Entities Involved (see note 3).

| *Abbreviation* | *Description* |
| --- | --- |
| Evans | Robert Evans, the plaintiff, is a subcontractor attempting to satisfy a judgment for his work on the Georgetown apartment complex in Springfield, Massachusetts. |
| Multicon | Multicon, an Ohio limited partnership, developed apartment complexes. |

| | |
|---|---|
| MCC | Multicon Construction Corporation, an Ohio corporation, acted as a general contractor in developing garden apartment projects sponsored by Multicon. |
| Georgetown | Georgetown of Springfield, was an Ohio limited partnership created to own an apartment development in Springfield. Multicon was Georgetown's general partner. |
| Edwards | Peter H. Edwards, an Ohio resident, owned half the stock in MCC, was one of its directors, and had helped form Multicon. |
| Kessler | John W. Kessler, an Ohio resident, owned the other half of MCC's stock, was also one of its directors, and also helped form Multicon. |
| MPI | Multicon Properties, Inc., was an Ohio corporation formed by Edwards and Kessler. Both men were directors and officers of MPI, but not its sole stockholders. |
| Bethlehem | Bethlehem Steel Corporation purchased sufficient MPI stock in to acquire control over MPI and MCC. |