Toomey, J.
INTRODUCTION
This matter was originally tried in the Fall River District Court where on August 8, 1994, the Court (Sullivan, J.) found for the plaintiff against the Intervenor/Defendant (“Gasparik”) in the amount of $14,877.29.[1] Gasparik asserted his right to a trial de novo and the complaint was lodged in the Superior Court. There, on June 10-11, 1997, a jury-waived trial was held. Based on the evidence adduced at trial, the following findings of fact shall be entered in accordance with Mass.R.Civ.P. 52(a).
FINDINGS OF FACT
1. In the 1970s, Gasparik operated several businesses, including Medical Devices of New Jersey (“MDNJ") of which he was an incorporator and the sole shareholder. MDNJ was engaged in the manufacture of surgical and medical hardware and owned certain fixtures and equipment used in the manufacture of that hardware.
2. After MDNJ ceased doing business, its equipment was delivered to Defendant, Medical Devices of Fall River (“MDFR”), which was engaged in the same business as had occupied MDNJ. The equipment remained on MDFR’s premises and was used by MDFR until it ceased operation in July 1991. MDNJ did not charge MDFR for the latter’s use of the former’s equipment.
*206 3. On October 21, 1975, MDFR was incorporated by Ernest and Phyllis Hoesterey and Gasparik served as Treasurer and Director. The Hoestereys had acquired the business from a tenant and were desirous that Gasparik operate the business. During the 1975-1991 life of MDFR, Gasparik served at various times as the corporation’s President, Clerk, Treasurer and Director. He owned, at various times, between 45 percent and 51 percent of the company while Ernest Hoesterey owned between 45 percent and 49 percent.[2] There were no other shareholders during MDFR’s existence.
4. In 1979, Gasparik loaned $87,000 to MDFR.
5. On March 31, 1983, Gasparik and MDFR entered into an agreement, the purpose of which was to secure the $87,000 loan made by Gasparik to MDFRin 1979. Gasparik, as President, signed the agreement on behalf of the debtor, MDFR; as Clerk, he signed the agreement certifying that the Directors had authorized the agreement; and, as creditor, he signed the agreement on behalf of himself.
6. On April 4, 1983, and on November 5, 1987, the agreement securing the 1979 loan was the subject of state and city UCC filings reciting that Gasparik was the secured party and MDFR was the debtor. Ernest Hoesterey signed the UCC filings on behalf of MDFR. The property pledged to secure MDFR’s debt to Gasparik was listed on the filing as “inventory, accounts receivable, and furniture, fixture and equipment...” Gasparik conceded that he had no list particularizing the property which secured his interest in the debt. The 1987 UCC filing was not reflective of a new loan by Gasparik but rather was a voluntary act by Gasparik resulting in his having an inferior secured position to that of another of MDFR’s creditors. See Para. 14, infra.
7. Most of MDFR’s equipment was owned by MDNJ. Most of MDFR’s fixtures was owned by MDFR.
8. During his association with MDFR, Gasparik’s operational involvement with the business affairs of MDFR was minimal; most, if not all, of the day-to-day and long-term doings of MDFR were conducted by Ernest Hoesterey and, occasionally, Phyllis Hoesterey.
9. Of his 1979 $87,000 loan to MDFR, Gasparik, in the late 1980s, forgave $40,000 in order to better the net worth appearances of MDFR. Of the $47,000 balance of the loan, MDFR made no repayment.
10. Gasparik did not charge any interest for any portion of the 1979 loan he had made to MDFR.
11. Notwithstanding his office as Treasurer of MDFR, Gasparik never prepared a Treasurer’s report. Furthermore, at the time of the cessation of its business (spring, 1991), Gasparik was unaware of MDFR’s inability to pay its debts, was unaware of MDFR’s debt to Kusinitz, was unaware of the circumstances of its accounts receivable, and was unaware of MDFR’s use of its income. MDFR did owe Gasparik a substantial amount ($20,000 — $40,000) at the time it closed down. MDNJ was similarly indebted to Gasparik. '
12. Ernest Hoesterey passed away in early 1991. At that time, Directors’ meetings were not regularly scheduled, and Gasparik had no knowledge of the quantum or value of Ernest Hoesterey’s shares or, for that matter, of his own holdings.
13. On June 10, 1991, Gasparik received a copy of MDFR’s accounts receivable.[3] He had, in the past, periodically received similar reports and noted that some of the receivables were being paid. On this occasion, he determined that MDFR’s income was insufficient to pay its creditors.[4]
14. Of the amount due to MDFR from the government contract, payments had been made directly to the bank that financed MDFR’s servicing the contract in order to retire MDFR’s debt to the bank, and those payments were not, therefore, available to assist MDFR in paying its debts.
15. On June 30, 1991, Gasparik “called” the secured loan by declaring it in default and demanding payment by July 10, 1991. Anticipating that MDFR would not pay its debt to him, Gasparik contemporaneously ordered a sale of the collateral in which he had a security interest.
16. The secured party sale was conducted on July 17, 1991. For sale were, according to the published notice, “inventory, accounts receivable, furniture, fixtures and equipment of [MDFR].” Although only MDFR’s assets were to be sold, the assets of MDNJ, located on MDFR’s premises, were not marked in such a way as to exclude them from the sale. There was no listing of MDFR’s accounts receivable to be sold. The auctioneer announced that the sale was of “one lot.”
17. One bid ($25,000) was received at the sale by the auctioneer. The bidder was a Mr. Goldman, who had driven from New Jersey with Gasparik for the purpose of attending the sale. Goldman carried with him a cashier’s check drawn on a New Jersey bank for $5,000, which was precisely 20 percent of the ultimate sale price.[5]
18. Goldman took possession of the items sold but left them on the premises of MDFR.
19. Goldman never paid the balance ($20,000) due on the sale price to MDFR.
20. The realty upon which MDFR was located and did business (594 Airport Drive, Fall River, MA) was held in tenancy by MDFR. The landlord was Industrial Park Realty, Inc. (“IPR”), which was owned by Gasparik and Ernest Hoesterey (or, at this time, his estate). There was no lease memorializing the tenancy; IPR and MDFR had, in the words of Gasparik, an “understanding.” The rent was paid irregularly, especially after Ernest Hoesterey’s death.
*207 21. Goldman began to conduct business as Northeast Surgical, Inc. on the premises formerly housing the business of MDFR.
22. Gasparik continued to serve as Treasurer of MDFR after July 17, 1991 sale, but no Directors’ meetings were called and business was poor. No successor to the deceased Ernest Hoesterey was seated on the MDFR Board.
23. In the five years following the sale, MDFR maintained a listing in the “Yellow Pages” of the local directory indicating its continued presence at 594 Airport Drive, Fall River, MA. One month after the sale, a sign remained on the premises describing the business as that of MDFR. For two years after the sale, at least three telephone calls to the business were answered with the greeting, “Medical Devices of Fall River, Incorporated.”
24. The business conducted by Northeast Surgical, Inc. on the former site of MDFR, after the sale to Goldman, involved the same furniture, equipment and processes and employed many, if not all, of the same personnel as had MDFR.
25. During its existence, Phyllis Hoesterey was an officer of MDFR, although she was not sure which office she held. She was also uncertain as to whether or not she was a shareholder in MDFR. She had been employed as a factoiy worker in MDNJ and as officer manager in MDFR. Ernest Hoesterey, until his death, managed the operations of MDFR, but Phyllis Hoesterey was unaware of the details of Ernest Hoesterey’s involvement, if any, in the ownership of MDFR. She was aware that Gasparik was, at least until the unnamed investor appeared on the scene, the majority shareholder of MDFR and that upon Ernest Hoesterey’s death, she inherited his shares. She never, however, saw the shares, knew of their value, knew of their present disposition, or had any knowledge of the probate of Ernest Hoesterey’s estate. She was also unaware of any annual meetings of MDFR, any records of meetings, or any successor for Ernest Hoesterey’s function in MDFR. During the nine months of Ernest Hoesterey’s terminal illness, during which he was hospitalized, and after his passing, MDFR continued its operation as it had when Ernest Hoesterey was fully involved.
26. Neither Phyllis Hoesterey nor Ernest Hoesterey’s estate received any disbursements from MDFR after the secured party sale.
27. Plaintiff (“Kusinitz”) provided a number of insurance policies (automobile, building, contents, liability, worker’s compensation) to MDFR. The loss payees on the policies were the insured (MDFR), the mortgagee, and the secured party (unidentified on the policy).
28. With respect to payment of the premiums, the practice over the years was for Kusinitz to pay the periodic premiums to the insurers and to send monthly bills to MDFR seeking recompense. MDFR would, ordinarily, not respond immediately to the bills but would pay the accumulated premiums when Kusinitz would make a follow-up call for reimbursement. Those payments were made by Phyllis Hoesterey at the direction of Ernest Hoesterey, who had obtained authorization for payment from Gasparik.
29. For the 18 to 24 months preceding Ernest Hoesterey’s death, Kusinitz did not make the follow-up calls seeking reimbursement on account of its compassion for Ernest Hoesterey’s condition.
30. In April 1991, after Ernest Hoesterey’s demise, Kusinitz made demand on MDFR for the total premium amounts then due to Kusinitz, to wit, $14,877.29. Those unpaid premiums pertained to policies of insurance covering MDFR from 1989 to 1991. MDFR has not paid the amount sought by the demand and has given Kusinitz no reason for its refusal.
31. OnAugust8, 1994, the District Court (Sullivan, J.) found for Kusinitz against Gasparik upon the instant complaint and assessed damages in the amount of $14,877.29.
RULINGS OF LAW
The decision for the plaintiff which was entered in the District Court serves as prima facie evidence on matters that are put into issue by the pleadings after the case is transferred to the Superior Court. G.L.c. 231, Sec. 102C. Unless that prima facie evidence is rebutted by evidence to the contrary, a verdict must, as a matter of law, be entered for the pariy which prevailed in the District Court. Forrey v. Dedham Taxi, Inc., 19 Mass.App.Ct. 955 (1985); Sylon Indus., Inc. v. Trim Knit, Inc., 13 Mass.App.Ct. 970 (1982). Therefore, the burden is on Gasparik to produce evidence which rebuts the decision of the District Court to pierce the corporate veil and hold Gasparik personally liable for the debt owed by MDFR to Kusinitz.
A corporation is a separate entity from the stockholders and officers. Albert Richards Co., Inc. v. Mayfair, Inc., 287 Mass. 280, 288 (1934). As a general rule, “stockholders and officers are not ordinarily personally liable for the acts and obligations of the corporation." Schultz v. Chalk-Fitzgerald Constr. Co., Inc., 309 F.Supp. 1255, 1257 (D.Mass. 1970). The purpose of laws permitting the formation of corporations and limiting the liability of its shareholders and officers is to balance the concerns of investors, who seek to cap their exposure to the extent of the corporation’s capitalization, with the interests of creditors, who seek the fullest measure of satisfaction of their legitimate claims. Hanson v. Bradley, 298 Mass. 371, 380 (1937).
The limits of tolerance for the protective pale of the corporate form are exceeded, however, if the corporate structure is used to inflict gross inequity, injury, or *208 fraud; in such a circumstance, equity will penetrate the corporate shield to remedy a wrong. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968). Piercing the corporate veil is permissible "in rare particular situations in order to prevent gross inequity.” Id. at 620. Piercing is a condign response when a control person who directs or participates actively in corporate operations ought, in equity, to become civilly liable, on principles of agency or causation. Piercing is in order when the corporation is used to cany out the control person’s own agenda. Id. at 614. In Evans v. Multicon Constr. Corp., 30 Mass.App.Ct. 728, 733 (1991), the court, citing Pepsi-Cola Metropolitan Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985), listed a supplemental series of factors to be employed in determining whether or not to disregard the corporate form of closely held corporations:
(1) common ownership; (2) pervasive control; (3) confused intermingling of business activity, assets or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; (12) use of the corporation in corporation in promoting fraud.
We must, therefore, apply the My Bread general principles and the Evans focused elements to resolve the instance piercing issue.
At bar, Kusinitz seeks to pierce the corporate veil because Gasparik has used the corporate form to “inflict gross inequity, injury, or fraud.” My Bread Baking Co., 353 Mass. at 614. Gasparik counters that piercing is inappropriate because Gasparik is not shown to have misused the corporate form to his advantage. This court finds that Kusinitz, buoyed by the “bounce” he receives from G.L.c. 231, Sec. 102C, has the better of the argument.
“Gross inequity” will result if Gasparik is allowed to escape payment of the debt owed merely by holding a public auction intended to make MDFR defunct and then continuing to conduct the same business, albeit under a different name. The totality of the facts, recited supra, suggests that his relationship with MDFR was one which granted primacy to his personal interests. Gasparik has offered no credible evidence which would tend either to erode the evidence supporting a piercing or to rebut the finding of the District Court that piercing was, in the circumstances, appropriate.
In addition, a number of the Evans factors favoring piercing the corporate veil are present in this case. Gasparik has common ownership and pervasive control of the several corporate entities involved in this case. He “forgave” a portion of a loan in order to rescue MDFR’s paper image, but he “called” the remainder of the loan in order to expose MDFR’s neck to the guillotine blade wielded by his travelling companion, Goldman. Gasparik’s curious manipulation of the loan demonstrates the essential identity of Gasparik and MDFR. He has commingled assets of the various corporations. Corporate formalities and basic record keeping practices have not been observed and no dividends have ever been paid to the stockholders. Moreover, it is clear that the corporate officers, if they were even aware of the offices they held, did not truly function as officers and directors. Finally, the swiftness with which the auction of MDFR’s assets was ordered by Gasparik after he pressed for repayment of his “loan,” the circumstances of Goldman’s less than arms-length involvement in the auction, and the piggy-backing of Northeast Surgical’s rather transparent succession to MDFR’s business on MDFR’s former turf all render incredible Gasparik’s protestations of a substantive distinction between himself and MDFR. In sum, the My Bread/Evans litmus turns the test paper to a “piercing” shade of blue.
“Where the principal shareholders of a close corporation fail to observe with care the corporation’s existence, a court will not later heed their requests to do so.” Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 16 (1985). The District Court held Gasparik liable for the debt MDFR owed to the plaintiff and, as noted above, that decision is prima facie evidence on the piercing issue presently before this court. G.L.c. 231, Sec. 102C. Gasparik has not met his burden of rebutting this ruling with credible evidence to the contraiy. The totality of the evidence adduced before this court compels the conclusion that the corporate veil should be pierced and Gasparik held personally liable for the debt concededly owed by MDFR to the plaintiff. Accordingly, judgment will be entered for the Kusinitz in the amount of $14,877.29 plus interest as required by law.
ORDER
For the foregoing reasons, I ORDER that judgment enter for the Plaintiff against the Intervenor/Defendant in the amount of $14,877.29.

 The original defendant, Medical Devices of Fall River, Inc., had been defaulted.

 An unnamed investor, who had supplied material to MDFR, acquired about ten percent of the stock of MDFR shortly before it ceased operations.

 At the time he received the June 30, 1991 list, Gasparik was aware that a veiy substantial account receivable (in connection with a government contract awarded to MDFR) was not included in the list.

 Gasparik was unaware that MDFR had not satisfied its premium obligations to Kusinitz over the past three years.

 The published notice of sale had specified that a 20 percent deposit was required to effect the sale.