Botsford, J.
The plaintiff Diane Dujon commenced this action to recover for personal injuries she sustained as a result of a collision between her car and a taxi cab in April 1990. The original defendants were the taxi driver and two corporations she believed to be the owner or owners of the cab. Thereafter, Dujon amended her complaint to add as defendants a variety of other corporations and Joseph Kurtz individually. Dujon principally claims that all defendants other than Williams are liable to her under theories of negligent entrustment of the taxicab, violation of *457 G.L.c. 93A, and, with respect to the defendant Kurtz, fraudulent conveyance.
The matter was tried before me without a jury from October 30 through November 2, 1995. Set forth below is a summary of the procedural history of this case, followed by findings of fact and a discussion of the legal issues raised.
I. PROCEDURAL HISTORY
This action was first filed in the Superior Court on February 26, 1991. In her original complaint, Dujon named as defendants Terry Williams, the driver of the taxicab she alleged had collided with her on April 22, 1990; Blue Hills Livery, Inc. (Blue Hills), the registered owner of the taxicab Williams was driving; and White Cab Association, Inc. (White Cab). The complaint alleged that Williams was liable on grounds of negligent driving, and that Blue Hills and White Cab were liable on the basis of their asserted status as registered owners of the taxi Williams was driving.
The case was remanded to the Boston Municipal Court before trial. After remand, Dujon amended her complaint on December 22, 1992. The amended complaint retained Williams, Blue Hills and White Cab as defendants but added Joseph Kurtz and most of the corporations who continue as defendants in this court. In her amended complaint, Dujon added to her original claims of negligence new claims of negligent en-trustment, alleged against Kurtz and all the corporate defendants; and violation of G.L.c. 93A, again alleged against Kurtz and all the corporate defendants. Dujon’s principal claim under the c. 93A count was that Kurtz operated all the corporate defendants as a common enterprise with the intent and purpose of shifting and concealing assets from individuals injured in or by taxicabs operated by his drivers.
The case was tried before a judge of the Boston Municipal Court (BMC) (Johnson, J.) from June 13 through 16, 1994. On March 30, 1995, the judge issued a decision. He found in favor of Dujon and against (1) Williams on the claim of negligence; (2) Blue Hills and White Cab on the claim of liability based on status as registered owner(s); (3) all corporate defendants on the claim of negligent entrustment; and (4) all corporate defendants on the claim of violation of G.L.c. 93A. The judge found against Dujon and in favor of Kurtz on the two counts of the complaint against him. Dujon was awarded $85,000 in damages on account of her injuries sustained in the car accident, and the judge trebled this amount as c. 93A damages, finding the conduct of the corporate defendants to have been knowing or willful. Thereafter, Dujon and the defendants both appealed the case to this court.
After retransfer to the Superior Court, Dujon moved to amend her complaint a second time to add two additional corporate defendants, D-Trans, Inc. and Nor-Ded Enterprises, Inc.; these corporations had been organized while the case was pending in the Boston Municipal Court. Dujon also added a claim of fraudulent conveyance against Kurtz. Dujon’s motion to amend was allowed, and a judge of this court (King, J.) also enjoined any of the defendants from transferring or disposing of any assets pending trial.
In October 1995, the defendants as well as Dujon moved for summary judgment on various claims. The defendants moved for summary judgment on Count Four of the second amended complaint (alleging violations of G.L.c. 93A against Joseph Kurtz and all corporate defendants), and on Count Five (alleging fraudulent conveyances by Kurtz). Dujon moved for summary judgment on all counts against all corporate defendants, and for partial summary judgment (liability only) against Kurtz with respect to Counts Four and Five.
After hearing, I denied the defendants’ motion, concluding that there were material issues of fact in dispute. I allowed Dujon’s motion for summary judgment with respect to Count One against Terry Williams in the amount of $85,000,[2] and also on Counts Two and Three against Blue Hills Livery, in the same amount as against Williams. I denied summary judgment on any claims of the other defendants, concluding there were factual issues that must be resolved (1) as to whether the corporate defendants other than Blue Hills should be liable on a theory that the operation of the corporations justified disregarding the separate corporate identities; and (2) concerning the liability of Kurtz both under G.L.c. 93A and the fraudulent conveyance claims.
Thus, as the trial started, the responsibility of Williams and Blue Hills for the accident in which Dujon was injured was established, and the amount of compensatory damages Dujon sustained as a result of those injuries was also fixed, viz., $85,000. The issues to be tried were these: (1) the liability of White Cab on the theory of being a registered owner of the taxi Williams was driving; (2) the liability of the corporate defendants (other than Blue Hills) and of Kurtz, individually, on a theory of negligent entrustment and separately under G.L.c. 93A; (3) questions requiring consideration of whether the separate corporate entities should be disregarded; and (3) whether Kurtz had fraudulently conveyed any property.
II. FINDINGS OF FACT
1. Diane M. Dujon was injured on April 22, 1990 in an automobile accident involving a taxicab owned by Blue Hills and leased and driven by Terry Williams. Dujon’s car was severely damaged in that accident; it was ultimately declared a total loss. In addition, Dujon herself sustained serious personal injuries. As a result of the proceedings in the Boston Municipal Court, she is entitled to compensatory damages in the amount of $85,000. The cab involved carried the statutory minimum amount of insurance at the time, $10,000.00 per person and $20,000.00 per accident.
*458 The Taxi Business of Joseph Kurtz
2. At the time of the accident, Blue Hills was a Massachusetts corporation with its principal place of business at 188 Providence Street in the Hyde Park section of Boston. Kurtz was the president, treasurer, clerk, director and sole stockholder of Blue Hills. Kurtz simultaneously held the same positions with respect to the following defendant corporations, all of which also operated out of 188 Providence Street: White Cab; Duo Cab Company, Inc.; Dedham White Cab, Inc. (Dedham); Norwood White Cab, Inc. (Norwood); Providence Auto, Inc. (Providence); Yak Yak Cab, Inc.; Smokey Cab, Inc.; and Komputer Finance Co., Inc.[3]
At all relevant times to this case, Kurtz has operated a taxi cab business through many of the defendant corporations. At the specific time of Dujon’s accident in April, 1990, he ran the business through the following five corporations; Blue Hills; White Cab; Norwood; Dedham; and Providence.
3. Blue Hills, Norwood and Dedham each owned taxicabs and related assets, including taxi licenses or permits and taxi meters. Blue Hills owned taxi permits for the town of Milton, Norwood owned permits for the town of Norwood, and Dedham owned permits exclusively for the town of Dedham. Individual drivers “leased” the taxicabs from one of these corporations, paying a fee for the use of the cab during each shift.[4] The “lease” agreement defines the driver’s relationship to the lessor corporation as that of an independent contractor; there was no contrary evidence introduced.
All the cabs owned by the different companies had the name and logo “White Cab Association” painted on the cab door. Each cab was assigned a number by White Cab’s manager so the cab could identify itself on the radio. The cabs were assigned numbers, on apparently a random basis, and the assigned numbers sometimes were changed, again apparently randomly.
4. White Cab and Providence were different from Blue Hills, Norwood and Dedham. White Cab provided a central dispatch and radio service for all the cabs owned by Blue Hills, Norwood and Dedham. Providence performed repair and maintenance work on the cabs owned by these companies. The garage out of which the work was done was located in the building at 188 Providence Street in Hyde Park. Kurtz owned the building in his personal capacity.
5. Blue Hills, Norwood, Dedham, White Cab and Providence all filed Federal and State tax returns during their respective corporate existences. Each corporation also filed all required certificates of condition and reports with the Secretary of State’s office, and it appears that each had its own bank account or accounts.[5]
6. Nevertheless, at an operative level, Kurtz exercised virtually complete control over all the corporations and ran them as a single enterprise.[6] For example, as indicated, White Cab provided a central dispatch service for all the taxicabs owned by Blue Hills, Norwood and Dedham. Each cab-owning corporation purported to pay a fee to White Cab for this service, but no bills or invoices were sent out. Nor was the “fee” a set amount. Rather, Kurtz personally set the fee to be paid by each cab-owning corporation on a monthly or more frequent basis, and the amounts varied widely. A chart reflecting payments made by Blue Hills and Milton White Cab to White Cab are set out in the footnote below.[7] Kurtz also set “fees” to be paid for radio services that varied.[8] For example, according to its tax returns, Blue Hills paid $33,000 in 1989 for radio services to White Cab. In 1990, Milton White Cab, the purported successor corporation to Blue Hills, paid $67,500 for radio services. The two corporations were the same size. There were no bills or records reflecting the nature or amount of services actually delivered, and neither Kurtz nor his accountant could really explain why the cost more than doubled in a year even though Kurtz personally set the amounts to be paid.
7. Similarly, Kurtz alone determined what amount each taxi-owning corporation would pay to Providence as a monthly fee for repair and maintenance work done. Providence did not keep any repair records, and no bills were ever prepared concerning the work done. Furthermore, according to Kurtz, the payments he arranged to be made to Providence by one or more of the corporations were not based on actual repairs or maintenance work performed, but on the number of cabs each company had functioning. However, Kurtz apparently had no records identifying cabs in service on a monthly or other regular basis. As with the dispatch fees or “radio association dues,” the amounts which the individual corporations paid Providence followed no regular schedule, either in amount or payment interval. With respect to Blue Hills, for example, the payments made in various months from January, 1989 through March, 1990 is shown in the table pictured in the note below.[9] Kurtz could provide no real explanation for the fluctuations in fees.
8. The payments made by Blue Hills and later by Milton White Cab to White Cab and Providence obviously represented payments between commonly owned organizations. On this score, in 1989, Blue Hills (according to its tax return) had gross revenues of $392,943. More than half of this total was paid to related individuals or entities as operating expenses, including: rental payments to Kurtz (presumably for use of the building at 188 Providence Street); $84,455 to Providence for repairs; and payments of over $96,570 to White Cab for radio association dues, dispatch service and management fees. In 1990, the tax return of Blue Hills’ alleged successor, Milton White Cab, showed that of $362,994 in gross revenues, approximately 70 percent was expensed to the related companies of White Cab and Providence, as *459 well as to Kurtz himself. Kurtz alone determined the amount of these expenses.
9. At the time of Dujon’s accident, Blue Hills was not insolvent from an accounting perspective. Its assets exceeded its liabilities, and it could pay its bills as they became due. However, it was also the case that the financial statements of Blue Hills as well as Milton White Cab list Kurtz as having made significant loans to each corporation, which were used in part to pay ongoing operating expenses.[10] There was no evidence of any loan documents, or of any corporate authorizations to borrow from Kurtz. Nor was any evidence introduced of notes or corporate votes memorializing or reflecting the loans made between and among the various Kurtz corporations that were described in testimony by both Kurtz and the corporations’ accountant.
10. Before, at the time of, and following Dujon’s 1990 accident, Kurtz as well as his wife were paid salaries by White Cab. The salary paid to Kurtz was for his services in managing the taxi business; his wife, Hinda Kurtz, was paid for bookkeeping services she rendered to all the Kurtz corporations. The salaries paid were certainly not exorbitant.[11] The Kurtzes also received health insurance from the Kurtz corporations. At least in some years, the premiums for the insurance were actually paid by Blue Hills and then Milton White Cab (see Ex. 19), even though neither Kurtz was ever employed by either corporation.
11. In addition to his salary, Kurtz also received payments from at least some of the corporations. For example, between January, 1989 and October, 1989, Kurtz wrote himself checks — usually on a weekly basis — on Blue Hills’ bank account which totaled $19,450. From the period of September 17, 1990 to May 12, 1992, Kurtz wrote himself a series of checks from the Milton White Cab account totaling $14,000. Despite the fact that each check was written for an easily recognized amount (e.g., $1,000, $2,000 or $5,000), Kurtz testified that he could not remember what any of these payments were for.[12]
The Accident and the Defendants’ Conduct in its Aftermath;
12. Dujon’s accident happened on April 22, 1990, which was a Sunday. In 1990, Kurtz was working on Sundays, and I infer he was at work at his facility at 188 Providence Highway for some portion of April 22. I further infer, despite his testimony to the contrary, that Kurtz was made aware of the accident between Williams and Dujon on that date or very soon thereafter.[13]
13. On April 25, 1990, three days after the accident, Kurtz applied to the town of Milton to transfer the taxi permits then issued to Blue Hills to a new corporation, Milton White Cab, Inc. (Milton White Cab).[14] Milton White Cab was not yet in existence, but was organized soon thereafter, on May 20, 1990. The articles of organization name Kurtz as president, treasurer and director, as well as sole stockholder. Although Kurtz testified that the reason for the creation of Milton White Cab and transfer of taxi permits from Blue Hills to the new corporation was to lower insurance premiums, I do not credit the testimony.[15] Rather, I infer from the timing that Kurtz’s reason for creating the new corporation and seeking the permit transfer was to avoid having Blue Hills be found financially liable for the accident involving Dujon and Williams.
14. On June 4, 1990, two weeks after forming Milton White Cab, Kurtz took formal corporate steps to dissolve Blue Hills (Ex. 7), although the articles of dissolution were not approved by the Secretary of State until October, 1991. Despite the dissolution of Blue Hills, both Kurtz and his accountant testified at trial that in fact all that had occurred was a reorganization and name change from Blue Hills to Milton White Cab, with a simple transfer of all Blue Hills’ assets and liabilities to the new corporation, and with Milton White Cab carrying on the taxi service business in Milton directly from Blue Hills.[16]
15. Nevertheless, on March 25, 1992, during the discovery phase of this case and before it was tried in the Boston Municipal Court, Robert Marra, the attorney representing Blue Hills as a defendant, wrote a letter to Dujon’s counsel, Deborah McCutcheon, in which he stated the following:
In our recent discussion, I told you that Blue Hills Liveiy, Inc. no longer exists. I enclose for your consideration a copy of the “Articles of Dissolution” filed with the Secretary of State.
As you know, Hanover Insurance Company has offered its policy limit of $10,000 on behalf of Blue Hills . . . The insured corporation no longer exists, and there are no personal assets.
Hanover’s offer of $10,000 in settlement on behalf of its insured remains. If the enclosed “Articles of Dissolution” satisfy your inquiry about Blue Hills ..., I wonder whether you would be willing to accept the offer and dismiss the complaint insofar as it pertains to Blue Hills . . . and Teriy Williams . . .
Less than a month later, on April 14, 1992, Kurtz signed answers to interrogatories propounded to Blue Hills in which he stated, inter alia, that Blue Hills had been dissolved and no longer existed as a corporate entity. There was no mention in the answers that Blue Hills had simply changed its name to Milton White Cab or that it had transferred its assets as well as liabilities to the new corporation.[17] Again, I infer from this conduct of Kurtz and Blue Hills that they were seeking, through omission, to disguise the true status of Blue Hills and thereby to avoid financial responsibility for the accident caused by Terry Williams beyond the available insurance.
The inference of Kurtz seeking to avoid responsibility for payment of damages on behalf of Blue Hills is *460 also supported by the manner in which Kurtz handled Blue Hills’ cash assets following the accident. Around the time that Blue Hills was dissolved in early June, 1990, Kurtz made out two checks to cash from Blue Hills’ account, one for $9587.00 (dated 5/31/90), and one for $2000.00 (dated 6/01/90). He could not remember what the checks made out to “cash” were for, or whether he personally deposited or cashed them. Kurtz did, however, pay himself $3,500 from Blue Hills’ account in June, 1990. He also continued to make out checks to himself drawn on Blue Hills’ account in each of the following five months (July through November); the total for the period was $6,250. As these dates reflect, these checks were written and payments made on them after Blue Hills was supposed to have been dissolved and no longer operating.
16. On April 6, 1992, Kurtz caused two new corporations to be created, Nor-Ded Enterprises, Inc. and D-Trans, Inc. Kurtz’ wife, Hinda Kurtz, was named as the sole stockholder of each corporation. In 1993, Kurtz dissolved Norwood and Dedham, and transferred all Norwood’s assets (taxis, taxi permits and meters) to Nor-Ded Enterprises, Inc. (Nor-Ded), and all the similar assets of Dedham to D-Trans, Inc. (D-Trans). At the time of dissolution, both Norwood and Dedham had been named as defendants in this case — they were added in December, 1992 — as had Kurtz himself. Particularly in light of this timing, I infer that the dissolutions of Norwood and Dedham, and the transfer of their respective assets to the two newer corporations were actions motivated at least in part by a desire on Kurtz’ part to remove the older companies’ assets from the potential reach of the Dujon lawsuit.[18]
Mrs. Kurtz was not aware at the time of trial that she was the sole stockholder of either Nor-Ded or D-Trans, but it did not surprise her to learn that she was, since, as she stated, there were “so many corporations,” although “it was all one business to [her] knowledge.” While Mrs. Kurtz did some bookkeeping for all the corporations, it was Kurtz who ran Nor-Ded and D-Trans; as Mrs. Kurtz stated, he was the onewho set the dues to be paid to White Cab for the radio and dispatch services, and all the other fees.
17. There are two more corporations in the picture. OnAugust26,1993, Coletti Trans., Inc. (Coletti Trans) and Temp Taxi, Inc. (Temp Taxi) were organized. Kurtz’ daughter, Shelley Coletti, was named as and remains the president, treasurer, clerk and director of Coletti Trans; she is also the sole stockholder. A man who works for Kurtz as a part-time manager of the taxi business, Vincent Tempesta,[19] is the sole stockholder of Temp Taxi, and holds the same offices in that corporation as Coletti does in Coletti Trans.
Upon the creation of these two new corporations, Kurtz caused the assets of Milton White Cab — 21 taxis and associated taxi meters, as well as 21 taxi permits for the town of Milton — to be split and transferred to them. In particular, 10 taxis, meters and permits were transferred to Coletti Trans, and 11 taxis, meters and permits were transferred to Temp Taxi. The purchase price for the assets transferred to Coletti Trans was $20,000, and the price for the assets transferred to Temp Taxi was $22,000 — thus, for each company, $2000 per “unit” of cab, meter and permit.[20] No money actually changed hands, but on August 27, 1993, Coletti and Tempesta each executed notes made payable to Milton White Cab; Coletti’s note was for $10,000 and Tempesta’s for $11,000.[21]
At some point in 1993, presumably following these transactions, Milton White Cab was dissolved as a corporation.
18. Despite the fact that Coletti and Tempesta respectively were the sole owners, officers and directors of the two new corporations, at least until July 1, 1994, Kurtz continued to write and sign all the checks which each company made out, and also remained the person deciding what should be paid to White Cab by each new company as fees for radio and dispatch services, management services, taxicab maintenance and repairs.[22] After July 1, 1994, it is not clear whether Kurtz or Coletti made out or signed the checks for Coletti Trans. With respect to Temp Taxi, Tempesta signed the checks, but Kurtz continued to write many if not all of them, and Kurtz also continued to make the management decisions for the company.[23]
19. Since the accident in 1990, Kurtz thus arranged for two separate transfers of the assets of Blue Hills, the original owner of the cab driven by Teriy Williams: once to Milton White Cab, and then from there to Coletti Trans and Temp Taxi. The creation of Coletti Trans and Temp Taxi, and the transfer of Milton White Cab’s assets to them, occurred approximately nine months after Milton White Cab had been added as a defendant in this action. In all the circumstances, I infer that these transfers, like the previous one to Milton White Cab itself, were motivated in whole or in significant part by a desire to shield the corporate assets in question from being reached to satisfy a judgment in Dujon’s favor.[24]
Discussion
As indicated at the outset, the issues presented at the present stage are whether (1) White Cab should be liable to Dujon under Count Two as a registered owner of the cab driven by Williams on April 22, 1990; (2) all defendant corporations as well as Kurtz should be liable on the claim of negligent entrustment under a theory of disregarding their separate corporate identities; (3) Kurtz and all defendant corporations should also be liable for unfair or deceptive conduct towards Dujon — a claim that at least with respect to the corporations requires again consideration of whether to pierce the various corporate veils; and (4) Kurtz caused fraudulent conveyances to be made of the assets of Dedham and Norwood. I consider each issue separately. Since the question whether or not to ignore *461 separate corporate identities is involved in several issues, I begin there.
A. Corporate Identities: Respect or Ignore?
Related corporations are generally regarded as separate and distinct from their stockholders and from each other. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 618 (1968) (My Bread Baking Co.). Courts have, however, looked beyond the corporate form to reach the related corporations and their stockholders when it is necessary to correct “fraud or wrong, or for the remedying of injuries.” Id. Common ownership and management of the stock of two or more corporations alone does not justify piercing the corporate veil to impose liability, but, in “rare particular situations [where additional facts are present the court will look beyond the corporate form] to prevent gross inequity.” Id. at 620. This may occur when
(1)there is active and pervasive control of related business entities by the same controlling persons and there is a fraudulent or injurious consequence by reason of the relationship among those business entities; or (2) there is “a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.”
Evans v. Multicon Construction Corp., 30 Mass.App.Ct. 728, 732-33 (1991), quoting My Bread Baking Co., 353 Mass. at 619.
The facts established here place this case firmly in the first category of cases described in the just-quoted passage. Kurtz exercised active and pervasive control over all the defendant companies, making virtually all the management decisions for them, and all the financial decisions. In addition, Dujon suffered from the manner in which Kurtz dealt with the corporations. The dissolution of Blue Hills and multiple transfers of its assets in particular impeded her ability to recover fair damages for the injuries she sustained in a timely and appropriate manner.
The criteria announced in My Bread Baking Co. case were further broken down into twelve factors in Pepsi-Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc., 754 F.2d 10, 14-16 (1st Cir. 1985) (Checkers); these twelve offer useful guideposts to evaluate whether to disregard separate corporate identities. See Evans v. Multicon Construction Corp., 30 Mass.App.Ct. at 723. The factors are:
(1) common ownership; (2) pervasive control; (3) confused intermingling of business activity assets, or management; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporate assets by the dominant shareholders; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; [and] (12) use of the corporation in promoting fraud.
Id. citing Checkers. Each factor is discussed below.
(1) Common ownership. There was common ownership of the defendant corporations. As for the four newer corporations, the evidence indicates Kurtz personally chose the owners: his wife (two companies), his daughter (one), and an employee (one).
(2) Pervasive control. Kurtz also exercised complete control over the corporations. He made the management decisions, determined what rates would be charged for inter-company services, and, after causing new companies to be created in the names of his family members and an employee, basically ran the new entities as well.
(3) Confused intermingling. There was confused intermingling of the Kurtz corporations’ business activities and assets. All of the cabs owned by the various separate corporations, including the cab involved in the accident with Dujon, had the “White Cab Association” name and logo painted conspicuously on them. A passenger or person coming in contact with the cab would reasonably conclude that he or she was dealing with a single entity which had responsibility for the enterprise.[25] As a matter of corporate organization, of course, this impression would not be accurate, since White Cab itself was a separate corporate entity from the companies owning cabs.
As the facts established here show, the intermingling of assets among the companies was extensive and lies at the heart of Dujon’s claim. At the top of the list are the successive transfers of assets originally belonging to Blue Hills to new corporations: first to Milton White Cab and then to Coletti Trans and Temp Taxi.[26] Beyond these whole-company asset transfers, however, Blue Hills and Milton White Cab made substantial ongoing payments to the two related entities of White Cab and Providence. While the payments were purportedly for legitimate services associated with a taxi operation — radio and dispatch services as well as vehicle maintenance and repairs — Kurtz had no records documenting any of the services, repairs or work actually performed and the payments themselves were randomly made in terms of payment schedule and amount. Rather than suggesting fees for services performed, the payment patterns suggest the shifting of funds in block amounts for reasons having no direct relationship to the legitimate business activities of either the payor or payee corporation.
(4) Thin capitalization. The evidence shows that Blue Hills and Milton White Cab were not insolvent, but Kurtz did have to advance money so that the companies could purchase new cabs and meet expenses. As in Evans v. Multicon Construction Corp., *462 supra, where the defendant corporation only had $500 in assets, the capital here was thin, but “. . . the pertinent question is whether it was too thin.” Evans, 30 Mass.App.Ct. at 734. The issue in the Evans case was resolved in favor of the defendant corporation because it “did not want for assets.” Id. In this case, Kurtz provided the companies with the operating money they needed to continue in business, so that they were not without assets. Moreover, this financial arrangement should not have been misleading in determining whether the companies had the ability to pay a judgment because the advances were made on an unsecured basis. Accordingly, I conclude that the capitalization was not too thin.
(5) Nonobservance of corporate formalities. Whether corporate formalities were observed is a close question. Each company had its own tax identification number, filed separate tax returns, had a separate bank account, filed the necessary certificates of condition with the Secretary of State, and, when dissolved, appeared in large part to file the appropriate corporate dissolution papers with the Secretary of State. On the other hand, Kurtz never documented any of the loans he made to the various corporations with the appropriate corporate votes or promissoiy notes, nor were there any notes executed with respect to the inter-corporate loans. As mentioned above, there also were no bills, receipts or invoices substantiating the inter-corporate work performed. A substantial amount of money was passed between and among the several related corporations, and the lack of corporate authorizations and documentation is significant.
In addition, the record demonstrates that atvarious points in time, Blue Hills and Milton White Cab, both of which had no employees, paid health insurance premiums for the Kurtzes as well as the fees of the accountants who serviced all the corporations and the Kurtzes personally. “Where there is common control of a group of separate corporations engaged in a single enterprise, failure ... to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses!,] • • • records, and finances, may warrant some disregard of the separate entities . . .” My Bread Baking Co., 353 Mass. at 620. Accord, Checkers, supra, 754 F.2d at 16 (“[w]hen the principal shareholder!] of a close corporation fail[s] to observe with care the coiporation’s existence, a court will not later heed [his] requests to do so”).
(6) Absence of corporate records. The discussion of the previous factor addresses this issue as well. As indicated there, the Kurtz corporations kept a number of significant corporate records — those required to be kept of filed by government agencies or offices — but lacked a wide variety of internal corporate records pertaining to the actual operation of the business. The absence of these records suggests a lack of respect for the separate corporate entities. Contrast Evans v. Multicon Const. Corp., supra, 30 Mass.App.Ct. at 734 (corporate records were “(n]either missing [n]or fudged”).
(7) No payment of dividends. The Kurtz corporations did not pay dividends, but as Subchapter S corporations, they would not in any event. This is not, therefore, a factor weighing in favor of piercing the corporate form.
(8) Insolvency at the time of the litigated transaction. As discussed above, neither Blue Hills nor any of the successor corporations was shown to have been insolvent when the litigation was commenced.
(9) Siphoning of corporate assets by the dominant shareholder. The record shows that Kurtz wrote himself a series of checks from Blue Hills and, later, from Milton White Cab; between 1989 and 1992, the total was $33,750.[27] Since Kurtz stated that he received his salary from White Cab, these checks presumably were not intended to represent salary payments, and Kurtz offered no other explanation for them. For many of the months in the time frame at issue, the checks were for $500 and were drawn on a weekly basis. On the record presented, the checks indicate that Kurtz did siphon away some corporate assets for his own benefit.
(10) Nonfunctioning of officers and directors. With respect to the corporations owned by Kurtz, he was the sole officer and director, and he certainly was involved in running the corporations’ business. As for the four newer corporations, however, although their owners (Mrs. Kurtz, Shelley Coletti and Vincent Tem-pesta) also served as the corporate directors and officers, they did not actually run the business at any time relevant to this action. Kurtz still made the management decisions and paid the bills. The factor of non-functioning officers, therefore, was partially made out.
(11) Use of the corporation for transactions of the dominant shareholders. There was no evidence here suggesting that Kurtz used corporate funds to pay a variety of personal expenses, or to obtain items for personal use. Compare Checkers, supra, 754 F.2d at 16.[28]
(12) Use of the corporation in promoting fraud. Dujon has proved that Kurtz used the corporations to further a fraudulent goal, namely, avoidance of duly imposed financial responsibility for Dujon’s accident. The findings reflect my determination that avoidance of liability was Kurtz’ purpose in dissolving Blue Hills and transferring its assets to Milton White Cab, while letting Dujon’s counsel be told that there was no successor corporation. The subsequent asset transfer to Coletti Trans and Temp Taxi was a continuation of the same fraudulent scheme designed to insulate corporate assets from being used to satisfy a judgment. Cf. Aronson v. Aronson, 25 Mass.App.Ct. 164, 166-67 (1987) (husband’s transfer of assets to trust at time of parties’ filing for divorce was fraudulently intended to prevent wife from claiming assets as part of marital estate and was properly set aside).
*463 In determining whether to disregard the corporate form, one must do more than simply count how many of the foregoing factors point towards piercing. Evans v. Multicon Construction Corp., supra, 30 Mass.App.Ct. at 736. The analysis requires evaluating all factors together to make the appropriate determination. Id. Here, factors that without more would be neutral— common ownership, pervasive control — were clearly established, and they were joined by factors that point more directly to injurious conduct: confused intermingling of assets and activities; nonobservance of many corporate formalities relevant to the internal operations of the taxi business; absence of significant corporate records; siphoning away of corporate assets for the benefit of the dominant shareholder (Kurtz); non-functioning of corporate officers and directors other than Kurtz; and use of the corporations to promote fraud. When one looks at the overall structure and operation of the Kurtz corporations, it is apparent that Kurtz intended to mislead Dujon to avoid liability.
In light of all the evidence, I conclude that this is a case where piercing the corporate form is appropriate, so that the various Kurtz corporations other than Blue Hills may be held to answer for Blue Hills’ liability to Dujon where Dujon has sought to have them do so. See My Bread Baking Co., supra, 353 Mass. at 619 (when liability is imposed on a group of “closely identified corporations, a court need not consider with nicety which of them ought to be held liable for the acts of one corporation for which the plaintiff deserves payment” [citation omitted]); Bump v. Robbins, 24 Mass.App.Ct. 296, 314-16 (1987) (closely identified corporation would be responsible for debt of its sister entity, where facts showed in substance a merger between the two). Moreover, in view of at least of (1) Kurtz’ central role in the management of Blue Hills and the other corporations, and (2) his actions in transferring assets of Blue Hills and other corporations to new entities in order to avoid making payments to Dujon, Kurtz should personally be responsible for the debts of Blue Hills. See Checkers, supra, 754 F.2d at 15-16 (commonly owned corporations and two individual shareholders held liable for debt of related corporation on evidence of unified control of companies, interchangeable use of corporate funds, use of corporate assets for individuals’ personal transactions and benefits, and lack of records).
B. Liability of the Corporate Defendants and Kurtz for the Judgment Against Blue Hills.
It follows from the decision to disregard the separate identities of the defendant corporations that insofar as Count Two of the second amended complaint is concerned, White Cab should be found liable along with Blue Hills for the injuries sustained by Dujon.[29] On Count Three (negligent entrustment), all the corporate defendants as well as Kurtz are to be held responsible for the judgment against Blue Hills.
C. Liability of Kurtz Under Chapter 93A.
The facts of this case lead to the conclusion that Kurtz’s conduct was both unfair and deceptive. The letter to Dujon’s counsel written by the attorney for Blue Hills, followed closely and supported by Blue Hills’ interrogatory answers, show an effort to persuade Dujon that the Blue Hills insurance policy limit of $ 10,000 was all that realistically was available. (See 15 of the findings above.) At the time of these communications — March-April 1992 — Blue Hills and Williams were the only viable defendants in the suit.[30] When the letter and interrogatory answers were sent, however, Kurtz knew that Blue Hills’ assets were available since, by his own admission, all that occurred in June of 1990 was a name change from Blue Hills to Milton White Cab. See Guzman v. MRM\Elgin, 409 Mass. 563, 566 (1990) (liabilities of selling corporation will be assumed by purchasing company where “successor is a mere continuation of the predecessor”; this is one exception to general rule of non-assumption of liability by successor corporation).[31]
The implication of no available corporate assets conveyed by the letter and interrogatory answers[32] was deceptive. See Leardi v. Brown, 394 Mass. 151, 156 (1985) (“an act or practice is deceptive if it possesses ‘a tendency to deceive’ ” [citation omitted]). The omission of information about the true status of Blue Hills created a false impression about its ability to answer a judgment, thereby increasing the likelihood of a creditor’s acceptance of the insurance proceeds as a full settlement. Wrongful withholding of information is an unfair act under c. 93A. Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 778-79 (1986).
Beyond the affirmative nondisclosure of material information, Kurtz also engaged in the series of corporate dissolutions, described in the findings, which engineered the successive transfer of Blue Hills’ available assets to other corporations. As indicated there, I have determined that these transfers were motivated in whole or part in part by a desire to remove the assets from what might be available to satisfy a judgment in this case. Certainly this conduct qualifies as “immoral, unethical, oppressive or unscrupulous,” and it did cause injury to Dujon. PMP Associates v. Globe Newspaper Co., 366 Mass. 593, 596 (1975) (citations omitted). Kurtz acted in a way that fits within the prohibitions of G.L.c. 93A, §§2 and 9.
Furthermore, in light of Kurtz’ knowledge of Dujon’s accident, his knowing nondisclosure concerning Milton White Cab’s relationship with Blue Hills and the purposeful transfer of assets to avoid liability, I conclude as well that Kurtz acted in a way that was knowing and willful. See Datacom Interface, Inc. v. Computerworld, Inc., supra, 396 Mass. at 780; Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 628 (1978). See also Anthony’s Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 475-76 (1992); McEvoy *464 Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 714 (1990). In the circumstances of this case, treble damages are warranted.
The actual damages under G.L.c. 93A which are to be multiplied are “the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence . . .” G.L.c. 93A, §9(3). Dujon has been found entitled to recover $85,000 for the underlying accident. This is the amount to be trebled, for a total of $255,000.[33]
D. Liability of the Corporate Defendants for Violation of G.L.c. 93A.
The unfair or deceptive conduct by Kurtz occurred in the context of his direction of the taxicab business enterprise, an enterprise in which the defendant corporations occupy central roles. Put another way, Kurtz, acting as the companies’ agent took actions designed to shelter corporate assets (as well as his own) from being available to satisfy any judgment Dujon might obtain. In this situation, the corporations should be held jointly and severally liable for the c. 93A violations committed by Kurtz. See Checkers, supra, 754 F.2d at 19. Contrast International Fidelity Co. v. Wilson, 387 Mass. 841, 856-58 (1983) (multiple damages to be awarded individually against separate defendants where independent wrongdoing was established) .
E. Claims of Fraudulent Conveyance Against Kurtz
Count Five of the second amended complaint alleges that Kurtz’ transfers of the assets of Norwood and Dedham to Nor-Ded and D-Trans, respectively, were fraudulent. The claim was not a real focus of the trial and Dujon’s post-trial submission does not address it. I consider the claim to be waived.
ORDER
For the foregoing reasons, it Ordered that in light of the determination that Dujon has prevailed on Count Four of the second amended complaint, alleging violations of G.L.c. 93A, the plaintiff Dujon is to serve an application for attorney’s fees and costs on the defendants on or before July 17, 1996, and to tile the application and any opposition of the defendants on or before July 30, 1996. The parties are requested to file a proposed form of judgment at that time which reflects the conclusions of this memorandum of decision. The parties are further requested to seek agreement on the form of judgement (without waiving any rights of appeal). If requested, a hearing will be held on the issue of attorney’s fees and costs as well as the form of judgement.

Terry Williams did not appear in this case before this court, and I am not clear whether he appeared or participated at any time in the BMC. Judgment was entered against him in the BMC, and Dujon’s motion for summary judgment on the count against Williams was unopposed in this court. Accordingly, Dujon is entitled to judgment as a matter of law on Count I against Williams. O’Brion, Russell & Co. v. LeMay, 370 Mass. 243, 244-45(1976).

During trial, at the close of Dujon’s case, her claims against Duo Cab Company, Inc., Yak Yak Cab, Inc., Smokey Cab, Inc., and Komputer Finance Co., Inc. were dismissed pursuant to Mass.R.Civ.P. 41(b). They are not further mentioned.

The license fees appeared to range between $50 and $70 for a shift, plus tax.

Each of the listed corporations except White Cab was dissolved after Dujon’s 1990 accident, although not all at the same time. The dissolutions are discussed below. As is also discussed below, Kurtz caused four new corporations to be organized in 1992 and 1993, two of which have been added as defendants to this action. It appears that the four newer corporations, Nor-Ded Enterprises, Inc., D-Trans, Inc., Col-etti Trans, Inc., and Temp Taxi, Inc., also filed Federal and State tax returns as well as required certificates of condition with the Massachusetts Secretary of State’s office. These corporations also had separate bank accounts.

In 1990, when Dujon was injured, Fred Bourne worked as a manager of the taxi business. He was on the payroll of White Cab. Bourne had died by the time of trial. According to Kurtz’s trial testimony, Bourne played a substantial role in overseeing the day-to-day taxi operations. According to Bourne’s deposition testimony, admitted as a trial exhibit (Ex. 20), he did not. In any event, the evidence as a whole was persuasive that even when Bourne was working, Kurtz remained in overall control of how the business ran. In particular, Kurtz was the person who made all the financial decisions.

Payments by Blue Hill Cab and Milton White Cab to White
MONTH CHECK DATES AMOUNTS PAID, BY CHECK DATE TOTAL PAID FOR MONTH
4/7 April, 1989 (BH) $3000 $3000
5/16 May, 1989 (BH) $2000 $2000
6/2 June, 1989 (BH) $2000 $2000
11/1; 11/15 11/20 November, 1989 (BH) $1000; $1000; $1000 $3000
3/14; 3/21 3/26 March, 1990 (BH) $4000; $1000; $2000 $7000
8/1; 8/10; 8/13; 8/20; 8/24 August, 1990 (MWC) $1000; $2000; $2000; $2000; $2000 $9000
9/5; 9/12 September, 1990 (MWC) $2000; $5000 $7000
10/2; 10/10; 1990 (MWC) 10/12; 10/18; 10/26 October, $2000; $1000; $2000; $1000; $2000 $8000
November, 11/5; 11/9; 1990 (MWC) ll/16;ll/26; 11/29 $2000; $2000; $2000; $2000 $2000 $10000
December, 12/6; 12/10; 1990 (MWC) 12/13; 12/24 $2000; $2000; $4000 $2000 $10000
January, 1/1; 1/7; 1/28 1991 (MWC) $3000 $2000; $2000; $7000
February, 2/2; 2/18 1991 (MWC) $2000; $2000 $4000
*465 March, 3/5; 3/20 $2000; $2000 $4000 1991 (MWC)
TOTAL:
$76,000

It is not clear to me whether the radio and dispatch services are in reality one service. Witnesses referred to “radio association dues,” which I took to mean the fees charged for the radio service, but there were also some references to fees for dispatching services, which may be something separate from the dues. In any event, the witnesses all seemed to agree that White Cab was the exclusive recipient of radio association dues and any payments for dispatch services.

Payments by Blue Hill to Providence:
MONTH CHECK DATES AMOUNTS PAID, BY CHECK DATE TOTAL PAID FOR MONTH
January, 1989 1/4; 1/23; 1/25 $1000; $1000; $1000 $3000
February, 1989 2/2; 2/13; 2/17; 2/23 $1000; $2000 $2000; $2000 $7000
March, 1989 3/1; 3/6; 3/13; 3/17; 3/22; 3/27 $2000; $1000; $1000; $1000 $1000; $1000 $7000
April, 1989 4/7; 4/10; 4/16; 4/20; 4/28 $1000; $1000 $2000; $1000 $2000 $7000
May, 1989 5/8; 5/16; 5/23; 5/30 $1000; $1000; $1000; $1000 $4000
June, 1989 6/8; 6/14; 6/20; 6/27 $1000; $1000 $1000; $2000 $5000
July, 1989 7/6; 7/13; 7/18; 7/26 $2000; $1000; $4000; $1000 $8000
August, 1989 8/7; 8/10; 8/15; 8/22; 8/30 $2000; $2000; $2000; $1000 $9000
October, 1989 10/4; 10/16; 10/24;10/27 $2000; $6000; $5000; $2000 $15,000
November, 1989 11/1; 11/6: 11/15; 11/20 11/20; 11/24; 11/29 $4000; $3000; $1640; $1000; $2000 $4000 $2000 $17,640
March, 1990 3/13; 3/21; 3/22; 3/26 $4000; $2500; $2000; $2000 $10,500
TOTAL:
$93,140

Blue Hills and Milton White Cab (as well as the other Kurtz corporations) were all Subchapter S corporations. According to Richard Band, the accountant for the corporations and for Kurtz, the difference between a loan and a capital contribution to a Subchapter S corporation is not necessarily significant.

In April, 1990, according to Kurtz, his annual salary was in the neighborhood of $30,000 to $40,000. At the time of trial, again according to Kurtz, he was paid a salary around $7200 a year. I am not clear whether there was evidence concerning the exact salary paid to Hinda Kurtz.

It also appears that payments made by the Kurtz corporations to the corporations’ accountants, Richard Band and his father, Maurice Band, included at least some amounts intended to cover personal accounting services provided by one or both Bands to Kurtz and his wife.

Kurtz testified that he did not have knowledge of the accident until he received a copy of the summons and original complaint in this action, in approximately February, 1991.1 do not credit this testimony. The evidence indicated that the taxi assigned to and being driven by Williams on April 22, 1990, cab no. 36, was not in service for two days following the accident; the dispatch records reveal that during those days Williams was still assigned to cab no. 36, but was driving cab no. 99. Moreover, a photograph introduced of the state of Dujon’s car after the accident — showing the side of the car entirely smashed in — suggests that the taxi itself must have also been injured in the collision. (Kurtz testified without contradiction that neither he nor any of the Kurtz corporations kept any records of taxi repairs, so the absence of any repair records relating to cab no. 36 is not material.) Given the level of Kurtz’s operative control over the taxi enterprise, and also considering the actions undertaken by Kurtz within days of the accident (described in the text below), I infer from all the circumstances that he must have been made aware of the accident at or very near the time of its occurrence.

The town of Milton later allowed the application for transfer.

My primary difficulty in accepting Kurtz’s reason for transfer as the real one is that neither he nor anyone satisfactorily explained why a change of the taxi permits from Blue Hills to the to-be-formed corporation of Milton White Cab would help lower insurance premiums. Furthermore, the insurance premiums for Milton White Cab increased each year in 1990, 1991 and 1992, supporting the view that the name change had nothing to do with insurance. As Dujon argues in her post-trial brief, the inference suggested by Kurtz’s explanation is that the creation of a new corporation with a different name might avoid having the insurance company set premium levels on the basis of the accident history of the original corporation. This is not a legitimate purpose, but more to the point in this case, if true, it further supports the conclusion that Kurtz knew early on about Williams’ accident in cab no. 36.

Kurtz testified that he never caused the assets of Blue Hills — the 21 taxicabs, the 21 Milton taxi permits and the taxi meters — to be valued in connection with the dissolution of the corporation and the acquisition of these assets by Milton White Cab. Kurtz evidently considered the absence of an appraisal to support his testimony that only a name change of Blue Hills was involved, rather than a true dissolution and sale of assets to Milton White Cab.

The corporate documents relating to the dissolution of Blue Hills indicate that both assets and liabilities were expressly transferred to Milton White Cab. (See Ex. 7.)
Kurtz himself was not a party to this case when Blue Hills’ answers to interrogatories were filed or when Blue Hills’ attorney, Marra wrote Dujon’s attorney McCutcheon. At the trial before me, Kurtz argued that Marra’s letter should not be admissible against him because Marra represented Blue Hills and not Kurtz personally. At the time, I accepted the argument, but on further reflection, I believe the document is properly considered against Kurtz. As the interrogatory answers show, and as all the evidence introduced reflects, Kurtz controlled Blue Hills and acted on its behalf in this litigation even before Kurtz himself was a party. The letter from Marra to McCutcheon is consistent with the answers to interrogatories which Kurtz himself signed soon thereafter. Based on the evidence presented, I find it inconceivable that Marra would take a position concerning the status of Blue Hills and its position in this lawsuit without the approval of Kurtz himself. Finally, as I conclude in this case that the corporate status of the various Kurtz corporations should be disregarded to reach Kurtz himself, it follows that Kurtz should be bound by representations made on behalf of his corporations, including Blue Hills, on agency principles.

As it turned out, Nor-Ded and D-Trans themselves were ultimately added as defendants in the second amended complaint filed by Dujon in 1995.

Before 1993, Tempesta had worked off and on as a taxi driver for one or more of Kurtz’ companies. Kurtz testified that he had chosen Tempesta to take over managing the taxi *466 business after the previous manager, Fred Bourne, had died; Kurtz further stated that he hoped Tempesta would some day assume control (and presumably ownership) of the business in its entirety. At the time of trial, Tempesta was working part time for the Kurtz taxi enterprise. He was paid by White Cab.

The price paid by the new corporations for Milton White Cab’s assets was very low, and, I conclude, below fair market value. Kurtz had no appraisal conducted of the taxis, permits or meters being sold. However, in connection with a lawsuit brought by another injured person against Milton White Cab and Kurtz, Kurtz executed an affidavit in May, 1993 — three months before the “sale” from Milton White Cab to Coletti Trans and Temp Taxi — which stated that the value of each Milton taxi permit was approximately $20,000. Furthermore, corporate records of Temp Taxi introduced into evidence reveal that the corporation had authorized Temp Taxi to pay $55,000 for its asset purchase from Milton White Co.

Each note called for monthly payments, to be first attributable to interest (set at 7 percent), and then to principal. There was no evidence as to whether these monthly payments were being made in accordance with the terms of the notes.

At some point in 1993, Providence was dissolved, and it appears that thereafter, the corporations owning taxis (which included Coletti Trans and Temp Taxi, among others) paid White Cab for maintenance and repair services related to those taxis. In other words, Kurtz through his entities continued to provide repair and maintenance services for the various taxis, but Providence did not continue as the corporation named to provide the services and be paid for them.

Kurtz and Tempesta testified that Kurtz was teaching Tempesta how to run the business. Be that as it may, it was still Kurtz making the decisions.

Since neither Coletti Trans nor Temp Taxi has been named as a defendant in this action, the strategy of transfer has in part been successful.

It is true that the cabs — or at least the cab involved in this case — also had painted on the back the name of the corporation owning the cab. This does not detract from the impression of common operation and concomitant responsibility created by the more prominently displayed “White Cab Association” sign.

Of course, the transfers of Norwood’s and Nedham’s assets to Nor-Ded and D-Trans, respectively, reflect the same type of intermingling.

This total does not include $11,787 which was drawn on of Blue Hills’ bank account in two checks made payable to cash. Kurtz signed those checks, but testified he could not remember what the payments were used for. On the record presented at trial, I infer that Kurtz may well have used this money himself. This would make the total funds which Kurtz received from Blue Hills and Milton White Cab $45,337.00 between January, 1991 and May, 1992.

In the Checkers case, the court found the factor of using the corporation for shareholders’ transactions satisfied where the defendant shareholder used company money to pay for accumulated personal expenses including health and life insurance premiums, his and his wife’s dental bills, and telephone service at his house.

White Cab is the only defendant other than Blue Hills named in Count II.

White Cab was the third defendant named in the original complaint, and identified in that complaint as a registered owner of the cab involved in the accident with Dujon. Minimal discovery, however, would have revealed to Dujon that Blue Hills alone, and not White Cab, was the registered owner of the cab in question. Accordingly, it would have been clear to Dujon that of the two corporations, only Blue Hills was potentially liable under G.L.c. 231, §85A. There was no other theory alleged at that time on which to hold White Cab liable.

Quite apart from the so-called name change testimony, the corporate dissolution documents make very clear that assets as well as liabilities were transferred from Blue Hills to Milton White Cab. Cf. McCarthy v. Litton Indus., Inc., 410 Mass. 15, 21 (1991) (a second exception to general rule of non-liability of successor corporation for debts of predecessor is where purchasing successor expressly agrees to assume liabilities).

The interrogatory answers signed by Kurtz two weeks after the attorney’s letter simply described the dissolution of Blue Hills without mentioning any transfer of assets and liabilities to another company. Unlike the letter, the interrogatory answers did not specifically state that there were no remaining assets. However, on the heels of the attorney’s letter, the answers did not need to do so to convey the same impression.

Dujon is also entitled to recover reasonable attorney’s fees and costs. A determination of fees and costs to be awarded must wait until Dujon’s attorney has submitted an appropriate application and the defendants have had a chance to respond.