In re TERRIFIC SEAFOODS,
INC., Debtor.

Harold B. MURPHY, Trustee, Plaintiff,

v.

Eric C. NUNES, Charles L. Nunes, Thom-
as R. Bastoni and Fleet National
Bank, N.A., Defendants.

Bankruptcy No. 92–13240–WCH.
Adv. No. 94–1420.

United States Bankruptcy Court,
D. Massachusetts.

July 2, 1996.

Charles A. Dale, III, Karen A. Whitley, Hanify & King, Boston, MA, for the Trustee.

Jeffrey L. Jonas, Brown, Rudnick, Freed & Gesmer, Boston, MA, for Fleet National Bank.

Gregory J. Koldys, Mickelson & Associates, New Bedford, MA, for Eric C. Nunes, Charles L. Nunes and Thomas R. Bastoni.

## DECISION

WILLIAM C. HILLMAN, Bankruptcy Judge.

Harold B. Murphy, the Chapter 7 Trustee (the "Trustee") of Terrific Seafoods, Inc. ("Terrific"), brought this adversary complaint against defendants Eric C. Nunes ("ECN"), Charles L. Nunes ("CLN"), Thomas R. Bastoni ("Bastoni") (collectively "the individual defendants"), and Fleet National Bank, N.A. ("Fleet"). The complaint contains a variety of causes of action against all of the defendants, including claims under 11 U.S.C. § 547(b) [1] and the *Deprizio* doctrine [2] alleging that certain payments to Fleet were fraudulent or preferential transfers (Count I) and that the same payments were intended to hinder, delay, or defraud the unsecured creditors of Terrific (Count II). The two counts brought solely against Fleet allege that it was unjustly enriched at the expense of certain creditors (Count III) and that Fleet's claims should be equitably subordinated pursuant to § 510(c) (Count IV). The counts brought against the individual defendants seek recovery of salaries paid to ECN and CLN under the authority of §§ 548 and 550 (Count V) and the recovery of transfers made prior to one year before the filing of the present case pursuant to § 544 and Mass.Gen.L. ch. 109A (Count VI). Further, the Trustee seeks to pierce the corporate veil of Terrific and to hold ECN, CLN, and Bastoni personally and jointly and severally liable for all of Terrific's unsecured claims (Count VII) and to equitably subordination of any of their claims against Terrific (Count VIII).

After trial I took the matter under advisement.

This is a core matter. The following constitute my findings of fact and conclusions of law.

## I. Findings of Fact

### A. The Beginning

In November, 1986 the three individual defendants established Terrific to deal in fresh and frozen scallops. Bastoni served as president and ECN as treasurer. Each of the three owned one third of the issued and outstanding shares.

Bastoni was responsible for day-to-day operations. While there is some testimony that CLN attended scallop auctions on behalf of Terrific prior to 1991, I find that at best he attended primarily on behalf of Sea View Fillet Company ("Sea View") and only inci-

---

1. Future references merely to section numbers are to Title 11, United States Code.

2. *Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Construction Co.),* 874 F.2d 1186 (7th Cir.1989) (*"Deprizio"* hereafter).

dentally, if at all, on behalf of Terrific. Sea View was a company owned by ECN and CLN. There is no indication that CLN performed any significant services for Terrific but, as noted below, CLN was a primary resource in obtaining the Fleet line of credit. It does appear, however, that ECN did perform some services for Terrific and was the primary officer involved in dealing with Fleet on a continuing basis.

ECN and CLN each received a salary of $500 per week from November 1986 through November 1991. In addition, all three received bonuses depending upon the profitability of Terrific, amounting to $20,000 each in 1987 and $13–15,000 to Bastoni and ECN in 1988.[3] In the year prior to the filing of the petition, ECN and CLN each received $16,000 in salary.

Sales peaked at over $8,000,000 in 1990 and declined thereafter as a result of worsening conditions in the fishing industry generally.

Initially the operations of Terrific were financed through Sea View. Both corporations operated from the same property which ECN and CLN also owned. Sea View would sell seafood to Terrific on credit and was repaid when Terrific resold the product. The profit to Terrific was retained as its working capital.

### B. The Fleet Loan

On February 24, 1987, Terrific obtained a line of credit from Fleet to replace its financing arrangement with Sea View. Fleet capped the line at $500,000, and made it subject to a formula which provided that advances would not exceed 50% of the value of inventory and 80% of accounts receivable aged less than 60 days.[4] To secure the demand note representing the line of credit Fleet was granted a properly perfected security interest in all or substantially all of

Terrific's assets. The individual defendants personally guarantied the line.

Fleet renewed the line of credit on November 15, 1990, based upon its belief that Bastoni, ECN, and CLN had agreed to inject $105,000 into Terrific in the form of subordinated debt. In an internal Fleet document dated the same day, the loan officer responsible for the account noted that Fleet had advanced "100% financing of the company's start-up in 1986" and further indicated that

"... the Terrific Seafood relationship ... has historically been handled as an accommodation based upon the managerial and financial strength of the guarantors, principally Charlie Nunes.... At the writer's request, principals Charlie Nunes, Eric Nunes and Tom Bastoni have agreed to inject a total of $105M into the company in the form of officer notes subordinated to [Fleet]."

A further Fleet document, dated January 24, 1991 indicated that the injection "will occur in the first quarter of 1991." It also concluded that Fleet's exposure of $805,000 was "marginally collateralized" with assets (eligible accounts, inventory, and machinery and equipment) with a book value of $1,337,-000 having an estimated liquidation value of $798,000, 99% of the balance outstanding.[5]

Subsequently, Fleet understood that the requested capital had been paid. A July 24, 1991 document states that

"Although $105M of equity in the form of subordinated debt has been injected into the Company it is not reflected in the year end numbers or the three month numbers. I spoke with the Company's accountant, Bob Pielech, who said this was an error and will be reflected in the six month numbers."

The same document indicates that Fleet's exposure was now $790,000, as against security with a fair market value of $1,007,000

---

**3.** The fact that CLN did not receive a similar bonus supports my conclusion that his services to Terrific were not substantial.

**4.** This is called "an informal formula" in a Fleet memorandum of January 24, 1991. The percentage on receivables may have been increased subsequently to 85%.

**5.** Fleet valued the receivables at 85% even though it was aware that receivables other than those due from Sea View were covered by credit insurance.

and a liquidation value of $662,000. The latter number is only 84% coverage of the exposure but Fleet still regarded the account as "marginally collateralized." Fleet's apparent lack of concern for its collateral no doubt results from the reiteration by Jeffrey DiSandro, the loan officer in charge of the relationship ("DiSandro"), that "our primary support for this credit continues to lie primarily in the strength of the guarantors and their proven management ability."

Fleet subsequently learned that no additional capital had been invested. In a letter dated October 30, 1991 DiSandro advised Bastoni that the capital injection was a condition to renewal of the loan beyond its expiration on November 15, 1991.

No funds were forthcoming and, in late December, Fleet converted the $599,000 balance of the line of credit to a "non-restoring demand loan" in that amount, with the balance payable in full on March 31, 1992.[6] Fleet "downgraded" its internal quality rating of the loan and referred it to the Classified Loan Department whose function is to collect troubled loan relationships. While DiSandro testified that there are worse classifications than that assigned to the Terrific account and the loan was not actually turned over to the Classified Loan Department but was being monitored by them, for purposes of this case the distinction is not relevant.

DiSandro prepared a Fleet internal memo dated December 20, 1991 in which he mentions the "poor capital position of the Company, poor earnings, and a continued soft industry" and notes:

"Due to current economic conditions and the desire to eliminate duplicate expenses, the Owners have recently decided to contract Terrific Seafood, pay-off Fleet's line of credit and roll the remaining business into Terrific's sister company Sea View Fillet."

Also on December 20, 1991, a credit reporting agency allegedly contacted DiSandro to obtain information regarding the financial health of Terrific. Through testimony, the Trustee attempted to establish that DiSandro knowingly represented that Fleet's relationship with Terrific was satisfactory and that all transactions were well handled at a time when the line of credit had been "converted." The parties spent a great deal of time exploring this incident both at trial and in their post-trial memoranda. I have doubts about the reliability of the credit agency's record keeping and am unable to find as a fact anything concerning the contents of the conversation.

Fleet officers met with Terrific's accountant on January 27, 1992. At that time it was "estimated that the shortfall on the Terrific debt would be in the zero to $100,000 range."

Notwithstanding these events, on February 12, 1992, DiSandro, who had been in charge of the account at the critical times in late 1991, informed Royal Bank Export Finance Co., Ltd. ("REFCO"), which had been purchasing accounts from vendors to Terrific, that Terrific was an excellent account and that Fleet "continued to support Terrific with a demand line of credit." This was a blatant lie, and all of the witness' attempts to justify his statement only served to make it more obvious that he knew exactly what he was doing when he made his false statement. He had written to Bastoni on December 24, 1991, referring to a prior discussion, that "the line has already been cancelled and additional borrowings are not longer permitted" and that the full principal of the loan would be due on March 31, 1992.[7] I find the testimony of DiSandro and the bank's expert witness that a "non-restoring demand loan" resulting from the cancellation of a line of credit is still a line of credit to be an insult to the intelligence of all within hearing and not credible.[8]

6. There was no explanation of why a demand loan requires an expiration date. In any event, a formal demand was made by Fleet's counsel on March 26, 1992.

7. The "commitment letter" enclosed is dated December 20, from which I conclude that the discussion was held no later than that date.

8. The Trustee suggests that if DiSandro lied on February 12, 1992, he also lied on December 20, 1991, but I am unable to make that leap.

By April 1, 1992 Terrific had reduced the $599,000 indebtedness to Fleet to $155,000.00 by a series to payments.

After the entry of the order from relief, Fleet obtained relief from the automatic stay. It liquidated its collateral and was left with a deficiency balance of $112,500. The guarantors subsequently paid $75,000 toward that amount.

### C. Capitalization and Earnings

The testimony was conflicting as to whether each of the individual defendants contributed $1,000 to the original capital of Terrific or each allowed $1,000 of earnings to be retained within the corporation. I find as a fact that no cash capital was contributed originally and that $3,000 of retained earnings was reclassified as paid in capital.

At no time did Terrific's assets exceed its liabilities by more than $67,000. According to Terrific's undisputed financial statements, prepared on a review basis by their accountant, the excess of assets over liabilities at 1989–1991 year end were:

| Year ending 3/31 | Excess assets over liabilities [9] |
|---|---|
| 1989 | $19,366.99 |
| 1990 | 53,077.33 |
| 1991 | 63,746.75 |

Internally prepared interim figures for the period ending September 30, 1991, indicate a loss of $9,465.43 for September, which resulted in a year-to-date loss of $8,298.01. Further losses were realized in October ($15,308.98) and November ($25,504.74). Applying these interim losses against the net asset total reduces the latter to $17,635.02.[10]

The accountant-prepared federal income tax return for the year ending March 31, 1992 (the day before the involuntary petition was filed) indicates a loss for the year of $273,924, and an ending negative retained earnings of $202,984.

Terrific's schedules, filed as of the petition date, indicate an excess of liabilities over assets of $249,046.13.

### D. The End

I find that the individual defendants determined in late December, 1991 to "wind down" Terrific's business, which would include paying off the Fleet indebtedness. The principals understood that repayment of Fleet would reduce their exposure on their personal guaranties.

At that same time, Bastoni's salary was reduced from $1,200 to $600 and the salaries paid to ECN and CLN ceased. Terrific sold equipment with an original cost of $220,111 in 1986 for $100,000 on February 15, 1992. This amount was just $9,109 less than depreciated book value. Terrific made payments to Fleet commencing January 8, 1992 and ending May 7, 1992, aggregating $412,500.

Subsequent to the Fleet letter of October 30, 1991, and at about the time of the conversion of the line of credit, Terrific made credit purchases from Laurence Sweeney Fisheries, Ltd ("LSF"),[11] Keeping & MacKay, Ltd. ("K & M"), and Wetterau, Inc. ("Wetterau") (collectively "the petitioning creditors"), for which payment was not made. The claims register reflects balances due to K & M of $47,500.00; to Wetterau of $7,504.32; and to LSF of $102,274.45.[12] During the period that those invoices were outstanding, Terrific paid Fleet $412,500. The undisputed testimony of ECN and Bastoni is that Terrific paid Fleet instead of the petitioning creditors in order to reduce the individual defendants' liability under their guarantees.

A final decision to close the business completely was reached in late February or March, 1992.

The petitioning creditors filed an involuntary petition on April 1, 1992. The petition alleged that the business "terminated" on

---

**9.** Retained earnings plus $3,000 paid in capital.

**10.** The parties stipulated that, as of November 30, 1991, assets exceeded liabilities by $18,976, closely in line with what I have computed.

**11.** LSF's claim was assigned to REFCO, which was the actual party in interest. For conve-

nience I will continue to refer to the claimant as LSF.

**12.** The claims of the petitioning creditors against Fleet have been assigned to the Trustee for the benefit of general unsecured creditors, including the assignors.

March 1, 1992. The order for relief under Chapter 7 entered on May 12, 1992.

## II. Discussion and Conclusions of Law

### A. Count I (Preference)

#### 1. Positions of the Parties

The Trustee alleges that, within one year of the commencement of this case, Terrific made preferential transfers totaling $412,500 to Fleet for the benefit of the individual defendants, who are insiders of the debtor. He seeks to recover that amount from Fleet under a *Deprizio* theory, and from the individual defendants under traditional preference theory.

Fleet asserts that it did not receive more as a result of the alleged preferential transfers than it would have received in a Chapter 7 liquidation of the debtor, as all payments were made from its collateral. It also asserts that Terrific was not insolvent during any portion of the preference period.

In addition to echoing Fleet's arguments, the individual defendants contend that the payments to Fleet were made in the ordinary course of Terrific's business.

#### 2. Preliminary Discussion

First of all, the Trustee's resort to *Deprizio* is unnecessary, for all of the payments were within the 90–day preference period of § 547(b)(4)(A).

■ A preference is a transfer which satisfies the five elements of § 547(b) and none of the exceptions under § 547(c).[13] The

---

**13.** (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

(3) that creates a security interest in property acquired by the debtor—

(A) to the extent such security interest secures new value that was—

(i) given at or after the signing of a security agreement that contains a description of such property as collateral;

(ii) given by or on behalf of the secured party under such agreement;

(iii) given to enable the debtor to acquire such property; and

(iv) in fact used by the debtor to acquire such property; and

(B) that is perfected on or before 10 days after the debtor receives possession of such property;

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

(5) that creates a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee caused a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interests for such debt on the later of—

(A)(i) with respect to a transfer to which subsection (b)(4)(A) of this section applies, 90 days before the date of the filing of the petition; or

(ii) with respect to a transfer to which subsection (b)(4)(B) of this section applies, one year before the date of the filing of the petition; or

(B) the date on which new value was first given under the security agreement creating such security interest;

Trustee has the burden of proving all of the elements of § 547(b) while the opposing parties carry the burden of proving nonavoidability. § 547(g).

I find as facts that there was a transfer of an interest of the debtor in property to Fleet, a creditor, made within 90 days of the filing of the petition, on account of an antecedent debt. The requirements of § 547(b)(1), (2), and (4) are satisfied.

### 3. Insolvency

■■ The transfer must have been made while the debtor was insolvent, § 547(b)(3). The debtor is presumed to have been insolvent during the 90 days immediately preceding the date of the filing of the petition, § 547(f).

The parties have stipulated that Terrific had an excess of assets over liabilities of approximately $19,000 at the end of November, 1991. By March 31, 1992, liabilities exceeded assets by just under $200,000. The payments to Fleet were in the first three months of 1992. This leaves for determination the critical issue: At what point did the fairly small excess of assets over liabilities become a deficit so that any transfers made thereafter were made while Terrific was insolvent? There is no direct evidence pointing to a solution.

■■ Where the debtor's financial condition is unascertainable as of the relevant date, courts often use the principle of retrojection to fill in the gaps. *See, e.g., Hassan v. Middlesex County National Bank (In re Mystic Pipe & Supply Corp.)*, 333 F.2d 838, 840 (1st Cir.1964), *cert. denied* 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964). That rule provides that when a debtor was insolvent on the first known date and insolvent on the last relevant date, and the trustee demonstrates "the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates," *id.*, the debtor is deemed to have been insolvent at all intermediate times. *Fo-*

ley v. Briden (In re Arrowhead Gardens, Inc.), 32 B.R. 296, 300 (Bankr.D.Mass.1983).

■ In this case it is stipulated that the debtor was solvent in November, 1991. The debtor was insolvent in March, 1992. In the interim, the business was being wound down and virtually all of its equipment sold. Retrojection is not applicable on the facts before me because Terrific was solvent on the first date and there was a significant change in circumstances.

Because no other evidence was introduced on this issue, I find insufficient evidence to rebut the § 547(f) presumption of insolvency, and I find that, for present purposes, Terrific was insolvent at the time of the transfers.

### 4. More than Chapter 7

■ The final element of the preference analysis is whether the transfer by Terrific enabled Fleet or the individual defendants to receive more than they would have received in a Chapter 7 case if the transfer had not been made.

I find as a fact that Fleet was not over secured, and probably under secured, at the time of the transfers, notwithstanding its virtually "blanket" perfected security interest in Terrific's assets. On January 27, 1992, Fleet met with Terrific's accountant and concluded that there would be at best a break even on the Terrific collateral, and there might be a shortfall in the "$100,000 range." The challenged payments began to be made on January 8, 1992, and only two of them (January 8 and 16) antedate the January 27 meeting.

As a result, this case falls squarely within the principle enunciated by Judge O'Brien in *Dietz v. Hanson (In re Hanson Restaurants, Inc.)*, 155 B.R. 758, 760 (Bankr.D.Minn.1993):

"A transfer of collateral to an unperfected creditor in satisfaction of an antecedent debt can be a preference because it diminishes the estate by allowing the transferee to receive more from the estate of an insolvent debtor than would be received if the transfer had not been made and the

(6) that is the fixing of a statutory lien that is not avoidable under section 545 of this title; or

(7) if, in a case filed by an individual debtor whose debts are primarily consumer debts, the

aggregate value of all property that constitutes or is affected by such transfer is less than $600.

case was a case under Chapter 7 at the time of transfer. However, a transfer of its collateral to an under secured, perfected, first priority creditor toward satisfaction of its debt, cannot be a preferential transfer to either the obligee or its guarantor."

*See also Travelers Insurance Co. v. Cambridge Meridian Group (In re Erin Food Services, Inc.),* 980 F.2d 792, 801 (1st Cir. 1992).

For that reason I find for the defendants as to this count. It is not necessary to consider application of the § 547(c) exceptions.

### B. Count II (Fraudulent Transfer)

#### 1. Whether the transfer was fraudulent.

"A transaction may be invalid both as a preference and as a fraudulent transfer. It may be invalid only as a preference or only as a fraudulent transfer." *Dean v. Davis,* 242 U.S. 438, 444, 37 S.Ct. 130, 132, 61 L.Ed. 419 (1917).

Terrific purchased more than $150,000 in goods from the petitioning creditors on and after December 18, 1991. The Trustee contends that Terrific had no intention to pay for those purchases and that the use of its receipts upon the resale to reduce indebtedness to Fleet was intended to hinder, delay, or defraud the vendors. He seeks recovery from Fleet as a fraudulent transferee under § 548(a)(1).[14]

The payments to Fleet were transfers of an interest of the debtor in property made within one year before the filing of the petition. The petitioning creditors were entities to which Terrific was indebted on the date such transfers were made. It remains only to determine the question of "actual intent to hinder, delay, or defraud." This is a factual determination. *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1255 (1st Cir.1991).

As the Court of Appeals pointed out in the last cited case, "It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors." *Id.* at 1254. The determination is necessarily made on the basis of the "recognized indicia or badges of fraud." *Id.*

Two of the corporate principals testified that the rapid paydown of the Fleet indebtedness was to reduce their liability under their guaranties. The timing is also relevant. The purchases from the petitioning creditors began virtually contemporaneously with the receipt of Fleet's official demand for payment in full in about three months. A transfer to an entity with which the debtor had a closer financial relationship than with other creditors evidences one of the classic badges of fraud. *Williams v. Kidder Skis International (In re Fitzpatrick),* 73 B.R. 655, 657 (W.D.Mo.1985), *reversed in part on other grounds sub nom. Kidder Skis International v. Williams,* 60 B.R. 808 (W.D.Mo.1985), cited with approval in *Sugarman.* Because of the existence of the personal guaranties, the relationship between Fleet and Terrific is such a relationship.

Another badge of fraud is insolvency or unmanageable indebtedness on the part of the debtor. *Id.* In the present case, Fleet was demanding an equity injection as early as November, 1990, an infusion of funds which the individual defendants were unwilling or unable to provide. Fleet renewed its demand in October, 1991, when it had discovered that no cash had been paid in. Less than two months later, and prior to the payments in question, Fleet canceled the line of credit and gave the principals three months to pay $600,000 in full.

As *Sugarman* teaches,

"The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evi-

---

14. "The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—(1) made such transfer or in-

curred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted ...."

dence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Id.* (citations omitted).

It is against this background that I find as a fact that the transfers to Fleet were fraudulent under § 548(a)(1).

### 2. Whether Fleet has a defense.

■■■■ Fleet argues that, even if I find the transfer to be fraudulent under § 548(a)(1), the Trustee cannot recover the sums paid because of the protection afforded it by § 548(c), the good faith purchaser defense.[15] That section protects a transferee to the extent that such transferee "takes for value and in good faith". The risk of nonpersuasion with regard to this issue is on Fleet. *Consumers Credit Union v. Widett (In re Health Gourmet, Inc.)*, 29 B.R. 673, 677 (Bankr.D.Mass.1983).

For purposes of the interpretation of § 548(c), "value" includes satisfaction of a present or antecedent debt of the debtor. § 548(d)(2)(A). It cannot be disputed that the payments in question reduced the liability of Terrific to Fleet. The remaining issue is whether the payments were taken in good faith.

■■■ "Good faith is an 'indispensable element' of § 548(c) but is not susceptible of precise definition." *Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir.1983). Judge Gabriel provided some guidance in *Health Gourmet, supra:*

"[A] transferee who gives value, but who takes security to repay itself an unsecured debt with knowledge of a debtor's insolvency will not be immune from the trustee's avoidance powers because this knowledge is equivalent to lack of good faith. *Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917). The lender's knowledge of the borrower's insolvency prohibits a finding that he is a good faith transferee. *McWil-*

*liams v. Edmonson*, 162 F.2d 454 (5th Cir.1947).

29 B.R. at 677.

While the facts of *Health Gourmet* are not identical to those now before me, the basic principle is applicable here—knowledge of Terrific's insolvency will deprive Fleet of the benefit of the § 548(c) defense. *Dean v. Davis, supra.*

"In short, the requirement of 'good faith' serves to bestow upon the bankruptcy courts wide discretion in deciding whether or not to permit a transferee of a fraudulently conveyed interest to seek shelter under section 548(c). Nevertheless, because at its essence 'good faith' connotes basic notions of honesty and fairness, its application in many instances can be predicted with reasonable confidence."

Stephen E. Snyder and Lawrence Ponoroff, *Commercial Bankruptcy Litigation* § 10.06[5] (1996).

With this background in mind, a review of what Fleet knew and did prior to the receipt of the challenged payments is required:

1. As early as November, 1990, Fleet was demanding that the principals inject $105,000 into Terrific in the form of subordinated debt.

2. Fleet deemed its loan 99% collateralized in January, 1991.

3. In July, 1991, Fleet regarded its loan as secured only by collateral with a liquidation value of $662,000, 84% of the then current $790,000 exposure.

4. In late December, 1991, Fleet terminated Terrific's ability to borrow and demanded that full repayment of $599,000 be made on March 31, 1992. At that time Fleet knew of Terrific's planned contraction and poor business conditions and earnings.

5. After Fleet held a meeting with Terrific's accountant on January 27, 1992, it learned that its deficiency might be as high as $100,000. At that time Terrific had made only $49,000 of the challenged payments.

15. "Except to the extent that a transfer or obligation avoidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."

I note also that Terrific paid Fleet a total of $263,500 after DiSandro's gross prevarication of February 12, 1992. No proper motive can be ascribed to DiSandro's conduct, and his misfeasance is easily "retrojected" one month to the receipt of the first of the payments.

Based upon all of these factors, I find as a fact that Fleet had knowledge of Terrific's insolvency when it received the payments, including the first $49,000. Its receipt of those payments was not in good faith.

As a result, I find that Fleet cannot avail itself of the § 548(c) defense. The total of the payments, $412,500, may be recovered by the Trustee.

### C.  Count III (Unjust Enrichment)

■ This count alleges that Fleet mislead the petitioning creditors into shipping goods in order to obtain the resale proceeds. As grounds, the Trustee relies upon Fleet's purported misstatements to a credit reporting agency on December 20, 1991.

As I have found that the Trustee has not sustained his burden of proof as to the content of the communication with the credit agency, I find for Fleet on this count.

### D.  Count IV (Equitable Subordination)

■ The Trustee alleges that Fleet's conduct in this matter was such that its claims against Terrific should be equitably subordinated pursuant to § 510(c).[16]

"The judge-made doctrine of equitable subordination predates Congress's revision of the [Bankruptcy] Code in 1978. Relying in part on our earlier cases ... the Fifth Circuit, in its influential opinion in *In re Mobile Steel Co.*, 563 F.2d 692, 700 (C.A.5 1977), observed that the application of the doctrine was generally triggered by a showing that the creditor had engaged in 'some type of inequitable conduct.' *Mobile Steel* discussed two further conditions relating to the application of the doctrine: that the misconduct have 'resulted in inju-

ry to the creditors of the bankrupt or conferred an unfair advantage on the claimant,' and that the subordination 'not be inconsistent with the provisions of the Bankruptcy Act.' This last requirement has been read as a 'reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable.' DeNatale & Abram, The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors, 40 Bus.Law. 417, 428 (1985)."

*United States v. Noland,* —— U.S. ——, ——, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748 (1996).

The *Mobile Steel* test has been specifically adopted by the First Circuit. *Capitol Bank & Trust Co. v. 604 Columbus Avenue Realty Trust (In re 604 Columbus Avenue Realty Trust),* 968 F.2d 1332, 1353 (1st Cir.1992).

Although the issue of whether equitable subordination always requires a finding of misconduct has been left open by the Supreme Court, *Noland* —— U.S. at ——, 116 S.Ct. at 1528, I am constrained by *604 Columbus Avenue* and other First Circuit precedents cited therein to make such a determination in the first instance.

■ Fleet was not in control of Terrific and hence cannot be considered an insider. As a result I follow the rule that "where a bankruptcy court has subordinated the debt of a creditor who was not an insider, it has done so on the ground that the conduct was egregious and severely unfair in relation to other creditors." *In re Giorgio,* 862 F.2d 933, 939 (1st Cir.1988).

The *Giorgio* court cited with approval *Bank of New Richmond v. Production Credit Association (In re Osborne),* 42 B.R. 988 (W.D.Wis.1984). That case holds that equitable subordination was proper where a creditor misrepresented the debtor's financial situation to another creditor so that the latter

---

**16.** "... after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim ...; or (2) order that any lien securing such a subordinated claim be transferred to the estate."

would continue to give the debtor credit. It is a close parallel to the present case.

In determining that a secured lender (PCA) should be equitably subordinated to a general creditor (General) Chief Judge Crabb reviewed the facts:

> "PCA clearly was aware of General's concern about the size of the Osbornes' [debtors'] account. PCA responded with equivocation and outright misrepresentations concerning forthcoming payment. PCA continued to reassure General even in the weeks immediately preceding its decision to terminate its support for the Osbornes, a decision which it must have known made General's prospects for payment bleak to nonexistent. Moreover, this course of conduct is clearly deliberate...." *Id.* at 999–1000.

DiSandro lied quite deliberately. I conclude that he did so with a view toward benefiting his employer by inducing REFCO either to continue to factor accounts of Terrific's vendors or to forbear from collection efforts. As Mr. Dooley said, "I think a lie with a purpose is wan iv th' worst kind an' th' mos' profitable." [17] The latter portion remains to be seen, but DiSandro's pronouncement certainly satisfies the initial "some type of inequitable conduct" inquiry under *Mobile Steel.*

The next question is whether Fleet's misconduct "resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." *604 Columbus Avenue,* 968 F.2d at 1353.

The only creditors whose claims are detailed in the record are the petitioning creditors. All of the shipments which they made (and which remained unpaid) were prior to DiSandro's conversation with REFCO. Thus there is no causation between their losses

and the misinformation originating with Fleet, and it did not result in injury to them.

For the same reason, the misconduct did not confer an unfair advantage to Fleet. Its general security interest in Terrific's assets extended to the proceeds received upon all sales of merchandise, whatever its source. While I find Fleet's conduct to be inequitable, it does not satisfy the requirements for the application of equitable subordination under § 510(c). Judgment will enter for Fleet on this count.

### E. Counts V and VI (Recovery of Salaries)

■ The Trustee next seeks to recover salaries paid to ECN and CLN within the year prior to the filing of the petition under § 548(a)(2) [18] and prior to that time by virtue of Mass.G.L. c. 109A.

I have found that ECN rendered some services for Terrific. I now hold that $16,000 was reasonably equivalent value for the services in the year preceding the filing of the petition. As to services rendered prior to that year, the evidence indicates that he did more work for Terrific at that time. Terrific reasonably equivalent value for those payments as well.

I find that CLN, on the other hand, did not provide services of any appreciable value in the year prior to filing. Therefore it is necessary to examine the other elements of the applicable statutes to determine if he is liable to return the $16,000 which he received to the Trustee.

There are three alternatives in § 548(a)(2)(B), one of which must be satisfied to conclude that the salary payment to CLN was fraudulent transfer.

First, I find that the trustee did not establish Terrific's insolvency. It was only by use

---

17. Finley Peter Dunne, *On Lying,* in *Mr. Dooley in Peace and War* (1898).

18. "(a) The trustee may avoid any transfer of an interest in property ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer ...; and

(B)(I) was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction ... for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."

of the § 547(f) presumption that he was able to prevail on the preference count of the complaint, and that presumption does not apply under § 548. The Trustee did not satisfy the first element, § 548(a)(2)(B)(I).

◼ Second, I must determine whether the transfer caused Terrific to engage in business with "any property remaining [being] an unreasonably small capital." § 548(a)(2)(B)(ii). As has been seen, Terrific actually had no capital, or at best $3,000, which I find to have been inadequate to conduct its affairs. "Unreasonably small capital" is not defined in the Bankruptcy Code or in the Massachusetts statute. Judge Kenner has said, however, that the phrase "denotes a level of capitalization that renders a debtor unable to generate sufficient profits, or at least cash flow, to sustain operations." *Ferrari v. Barclays Business Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 132 (Bankr. D.Mass.1992), citing *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir.1992). I believe that her view is correct.

However, under the facts of this case, I believe that $16,000 is *de minimis* and did not make any difference in Terrific's ability to sustain operations. The Trustee has not satisfied the second element.[19]

Finally, I find that the Trustee has presented no evidence that there was an intention to incur debts beyond the debtor's ability to pay as such debts matured. § 548(a)(2)(B)(iii).

The same conclusions apply to Mass.G.L. c. 109A § 5.

As a result, judgment will enter for ECN and CLN on Counts V and VI.

### F. Count VII (Piercing the Corporate Veil)

◼ The Trustee seeks to pierce Terrific's corporate veil in order to hold the individual defendants personally liable for all of the corporation's unsecured debts. The governing law is that "shareholders may be held liable where they control the operation of the corporation and run it for their personal benefit, and where justice requires that the separate existence of the corporation be ignored." *Pepsi–Cola Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 15 (1st Cir.1985).

*Checkers* is inapplicable because the facts were much stronger, in a negative sense, then those before me. It involved three corporations which were owned by a husband and wife. A fact the Court found to be critical was that the corporations paid personal expenses of the individual shareholders, including retroactive payment of expenses incurred before they became the sole shareholders of the corporations. The Court applied the standard developed in *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 233 N.E.2d 748 (1968).

That case involved an attempt to pierce the veils between multiple corporations, rather than between a corporation and its shareholders as here. The court looked for a "confused intermingling of activity" and "substantial disregard of the separate nature of the corporate entities" in making its determination. 233 N.E.2d at 752. The court found sufficient evidence to justify piercing the corporate veil.

There is no evidence of such or similar activities on the record before me. I decline to find that the present case is a situation where justice requires that the separate existence of the corporation be ignored. Judgment will enter for the individual defendants as to Count VII.

### G. Count VIII (Equitable Subordination)

◼ In his final count, the Trustee seeks to equitably subordinate the claims of the individual defendants against Terrific. Review of the claims register does not reflect that any such claims have been filed. The bar date for the filing of claims was September 30, 1992. On that basis, I find the Trustee's arguments to be unfounded and find for the individual defendants on Count VIII.

---

**19.** I need not reach the interesting issue of whether a corporation which had no capital to start with can ever make a transfer which satisfies this requirement. *See Lackawanna Pants Mfg. Co. v. Wiseman*, 133 F.2d 482, 485 (6th Cir.1943).

Judgment will enter in accordance with this decision.